# Exhibit 47, Part 4

services provided by Ganymede. The Agreements only define the "services" as "tax reclaim advisory services provided by [Ganymede] in the relevant Jurisdiction."[276]

227.    Based on my review of account statements and invoices, each Bellwether Plan paid Ganymede a percentage of its refund ranging from approximately 66% up to over 98%, as shown in **Table *2*** below.[277]

### Table 2 – Ganymede Payments

| Plan | Tax Refund | Ganymede Payments | % of Refund |
|---|---|---|---|
| Bernina Pension Plan | $ 10,358,759 | $ 6,875,498 | 66.4% |
| RJM Capital Pension Plan | $ 10,621,413 | $ 7,107,621 | 66.9% |
| Delvian LLC Pension Plan | $ 11,923,504 | $ 7,849,298 | 65.8% |
| Basalt Ventures LLC Roth 401(k) Plan | $ 4,150,978 | $ 3,113,233 | 75.0% |
| STOR Capital Consulting LLC 401(k) Plan | $ 3,957,606 | $ 2,968,205 | 75.0% |
| Edgepoint Capital LLC Roth 401(k) Plan | $ 4,704,675 | $ 3,528,506 | 75.0% |
| Loggerhead Services LLC Roth 401(k) Plan | $ 10,455,774 | $ 7,841,831 | 75.0% |
| Roadcraft Technologies LLC Roth 401(k) Plan | $ 9,959,185 | $ 7,469,389 | 75.0% |
| The Bareroot Capital Investments LLC 401(k) Plan | $ 4,380,378 | $ 3,285,283 | 75.0% |
| The Costello Advisors Pension Plan | $ 4,015,602 | $ 3,889,380 | 96.9% |
| The LBR Capital Pension Plan | $ 4,290,593 | $ 4,118,328 | 96.0% |
| The FWC Capital LLC Pension Plan | $ 10,484,112 | $ 10,275,618 | 98.0% |
| The Proper Pacific LLC 401(k) Plan | $ 4,318,902 | $ 4,150,142 | 96.1% |
| The Oaks Group Pension Plan | $ 10,319,909 | $ 10,140,940 | 98.3% |
| The SVP 401(k) Plan | $ 3,806,446 | $ 3,689,260 | 96.9% |

228.    As discussed below in paragraph 263, my analysis indicates that these percentages are consistent with amounts paid to Ganymede by the rest of the Plans.

### B.    Recruiters

229.    While the Plans themselves received tiny shares of the refund amounts, certain individuals did receive enormous compensation for their role in recruiting others to establish pension plans (or to allow plans to be established in their name).

---

[276] *See*, for example, Tax Reclaim Advisory Services Agreement between Ganymede and California Catalog Company Pension Plan (MPSKAT00022222). I have only seen written agreements with Ganymede for less than 15 of the Plans.
[277] *See* Exhibit 4 for further detail.

### 1.    Markowitz/van Merkensteijn/Klugman

230.    As described in section V.A, beginning in summer 2014, entities controlled by Markowitz, van Merkensteijn, and Klugman entered into partnerships with 26 Plans with participants who were friends and family of Markowitz and van Merkensteijn.[278]  As with all Plans associated with Solo, the majority of the refund payments generated by these plans were retained by Shah's entities.  Specifically, Klugman, Markowitz, and van Merkensteijn agreed with Shah that for the new Plans established in 2014, Ganymede would receive 75% of the gross refund paid by SKAT.[279]  After "fees" to Ganymede had been paid, it was Markowitz, van Merkensteijn, and Klugman who reaped the overwhelming majority of what remained of the tax refund payments.

231.    Three of the Bellwether Plans (Roadcraft, Loggerhead, and Bareroot) entered into partnership agreements with RAK Investment Trust (Klugman's entity) and Routt Capital Trust (Markowitz's entity) through which those two entities received, respectively, 25% and 70% of the available proceeds net of Ganymede's fee.[280]  The Plans themselves were left with 5% of the remaining funds.  For Roadcraft, that represented a total of $121,967, or 1.2% of the total tax refund and 0.2% of the gross dividend; for Loggerhead, a total of $120,514.21, or 1.2% of the total tax refund and 0.2% of the gross dividend; and for Bareroot, a total of $47,336.98, or 1.1% of the total tax refund and 0.3% percent of the gross dividend.[281]

232.    The Kaye Scholer Plans that Markowitz's, van Merkensteijn's, and Klugman's entities entered into partnerships with generated over $163 million in tax refund payments.[282]  As a

---

[278]  Klugman himself did not recruit anyone to create Plans in 2014 through 2015 but received stakes in the partnerships consistent with finder's fees for having first introduced Markowitz and van Merkensteijn to Shah.  *See* Deposition of Robert Klugman dated January 28, 2021, 78:5 – 79:5; 80:10 – 81:7.  In fact, although Ronald Altbach, Joseph Herman, Robin Jones, Perry Lerner, and David Zelman entered into partnership arrangements with Klugman through which he received this enormous amount of money, each testified that they either did not even know Klugman or did not know that he entered into a partnership with their Plans.  Deposition of Ronald Altbach dated October 30, 2020, 217:13-24; Deposition of Joseph Herman dated July 9, 2020, 122:17 – 124:9; Deposition of Robin Jones dated November 4, 2020, 79:14-21, 80:17-20, 81:5-22; Deposition of Perry Lerner dated September 16, 2020, 129:18 – 130:3; Deposition of David Zelman dated December 11, 2020, 115:8 – 116:1.  Similarly, Klugman testified that he did not know Altbach, Herman, Jones, Lerner, or Zelman.  *See* Deposition of Robert Klugman dated January 28, 2021, 30:3-16.

[279]  Klugman Tr. at 65:16-21.

[280] As discussed *supra*.

[281] See Exhibit 4 for further detail.

[282] See Exhibit 1.

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 89

result of the partnership arrangements with those Plans, the entities controlled by Markowitz, van Merkensteijn, and Klugman stood to receive approximately $15 million, $13 million, and $10 million, respectively, from those Plans' refund applications.[283]  My analysis of payments made from the Plans' bank accounts and their accounts at the Solo Custodians indicate that the Markowitz, van Merkensteijn, and Klugman entities received amounts consistent with their shares of the partnerships.

233.    Markowitz and van Merkensteijn also profited from Plans even when their entities were not partnered with them.  Based on my review of partnership agreements, if Markowitz's entity was partnering with a Plan, van Merkensteijn would typically be appointed Manager of the Plan, and vice versa.[284]  This entitled Markowitz and van Merkensteijn to payments of $10,000 per year per plan for which each had the title of "Manager".

234.    To demonstrate how these payment flows operated consistent with the agreements among Solo and the Recruiters, I detail below fund flows in and out of Roadcraft's accounts at the Solo Custodians.

## 2.    Roadcraft Payment Flows

235.    On July 3, 2015, Goal Taxback, after receiving payment from SKAT in connection with Roadcraft's application for withheld dividend tax on shares of Coloplast A/S-B, and after taking its fee, paid DKK 1,774,684.98 to the Roadcraft Plan's account at Solo Capital.[285]  Just prior to receiving this payment, the Roadcraft Plan's DKK cash account at Solo Capital had a zero balance.  On July 20, 2015, the Plan paid Ganymede DKK 1,342,424.34, exactly 75% of the gross refund.[286]

236.    On July 16, 2015, Goal Taxback made refund payments for 13 dividend reclaims to the Roadcraft Plan's account at Solo Capital, totaling DKK 64,705,492.56.[287]  On August 7, 2015, the Roadcraft Plan sent a total of DKK 48,784,434.09 to Ganymede from their Solo

---

[283] Calculated by applying the relevant partnership percentages to the tax claim after taking into account the payment to Ganymede of 75%.

[284] See, e.g., WH_MDL_00012567; MBJ_STOR-0002765.

[285] See MPSKAT00008759 at -8784 (Roadcraft Solo 2015 Account Statement).

[286] See MPSKAT00008759 at -8784 (Roadcraft Solo 2015 Account Statement); MPSKAT00010288 (Ganymede July 7, 2015 invoice to Roadcraft Plan).

[287] See MPSKAT00008759 at -8784 (Roadcraft Solo 2015 Account Statement).

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 90

Capital account in relation to these 13 refund payments.[288]  This also amounts to 75% of the total gross refunds paid to the Roadcraft Plan for those 13 dividends.

237.    In total, for the 14 refund applications made by the Roadcraft Plan in 2015 and one refund application in 2014, Goal Taxback paid out DKK 67,605,754.05 (approximately USD $10 million) to Roadcraft for tax refunds.[289]

238.    Over the course of its existence, the Roadcraft Plan received two payments from Solo Capital into its checking account at Wells Fargo: $109,908.00 in August 2015[290] and $238,037.42 in November 2015.[291]  These payments reflect two different methods by which the Recruiters received their cuts – for distributions made in summer 2015, Solo Capital paid the Recruiters their cut directly and the Plans' smaller cut directly to the Plans, and for distributions made in November 2015, Solo Capital sent the aggregate of the Recruiters' cut and the Plans' cut in one payment to the Plans' bank account.  For the November 2015 distributions, the Plans were responsible for making the further payments to the Recruiters.

239.    For example, in August 2015, Solo distributed funds to the Roadcraft Plan, the Routt Capital Trust, and the RAK Investment Trust directly from the Roadcraft Plan's Solo Capital account to the U.S. bank accounts of the Roadcraft Plan, the Routt Capital Trust, and the RAK Investment Trust.  The payment amounts matched the percentages due under the Roadcraft Partnership Agreement:[292] $1,540,000 to the Routt Capital Trust (70% of the total Solo Capital distribution); $550,000 to the RAK Investment Trust (25%); and $109,908 to the Roadcraft Plan (5% of the distribution from Solo Capital).[293]

240.    For the money transferred by Solo Capital in November 2015, the Roadcraft Plan made the partnership payments from its bank account at Wells Fargo.  Of the $238,037.42,

---

[288] See MPSKAT00008759 at -8784 (Roadcraft Solo 2015 Account Statement); WH_MDL_00050282 (Ganymede July 13, 2015 invoice to Roadcraft Plan).
[289] Calculated using the exchange rates used in Roadcraft's Old Park Lane and Solo Capital account statements (MPSKAT00007347 and MPSKAT00007012).
[290] RC00000097.
[291] RC00000069.  Notably, even when a Plan used another Shah-custodian besides Solo, transfers of funds to that Plan's account would also come from Solo's bank account.  For instance, the Limelight Global Productions LLC Roth 401(k) Plan used Telesto as its custodian but received its payments from a Solo account.  See LL00000063; LL00000078.
[292] WH_MDL_00029401.
[293] See MPSKAT00008759 at -8783 (Roadcraft Solo 2015 Account Statement); RC00000097.

CONFIDENTIAL
**Expert Report of Bruce G. Dubinsky**
**December 31, 2021**
**Page 91**

Roadcraft paid the Routt Capital Trust $167,050.00 (70.17%) and the RAK Investment Trust $59,000 (24.78%).[294]

241.    In total, the Roadcraft Plan retained only $121,967 USD, or 1.2%, of the refunds paid by SKAT.[295]  The flow of funds is depicted below in Figure 36.[296]



**Roadcraft Tax Refunds: $9,959,185**

Paid to Plan
$121,967

Partnership
Payments
$2,316,050

Trading/Broker Fees
$148,186

Reclaim Agent
$53,866

Ganymede
$7,469,389

**Figure 36 – The Roadcraft Plan Tax Refunds**

242.    Payments from friends and family Plans were not the only means by which Markowitz, van Merkensteijn, and Klugman profited from their involvement in the scheme.  Each of these defendants also established pension plans in which they themselves were the participants.[297]  And unlike the friends and family members they recruited, these individuals

---

[294] RC00000100.
[295] *See* Exhibit 4 for additional detail.
[296] 121,967 is 5% of the total distributed to the Plan and the Partners: $121,967 = 5% x ($121,967 + $2,316,050). There was an additional deposit from Solo Capital of $109,980 on August 28, 2015 plus a deposit of $39,989.88 into Roadcraft's Solo Capital account from an unknown source. As a result, the difference in the amounts shown in Figure 36 and the tax refunds paid to the Roadcraft Plan is approximately $150 thousand.
[297] From August 2014 through mid-2015, Klugman had five Plans; Markowitz four; and van Merkensteijn four. *See* Exhibit 1.

retained a higher percentage of the refund payments paid by SKAT, specifically 25% of the refunds paid by SKAT, net of fees paid to the payment agents, the brokers, the custodians, and Ganymede.[298]

### 3.    Lehman, Bradley, Tucci, and Crescenzo

243.    The remaining Recruiters received compensation for bringing others into the scheme via payments from Solo-affiliated entities.  In 2015, the flow of the payments was generally as follows: The Plans would pay Ganymede, which would in turn transfer funds to Elysium Global Limited (a BVI entity controlled by Shah).[299]  The funds would then be transferred to four offshore entities, which would then transfer the funds to U.S. shell entities controlled by Lehman, Bradley, Tucci, and Crescenzo.  The entities established by these four individuals were all created in 2015, shortly before they began to receive transfers of millions of dollars for "consulting" or similar services purportedly provided to the four offshore entities.[300]  According to Bradley, Tucci, and Crescenzo, the only services provided by them or their entities was the introduction of friends and family to the scheme.[301]

### 4.    Roger Lehman

244.    Roger Lehman received millions of dollars of payments from Ganymede or other Shah-controlled entities.  Some of these were based on a percentage of the refunds paid by SKAT to various pension plans.  Payments to Lehman were typically made to one of two entities owned and controlled by Lehman: Valerius LLC ("Valerius") or First Alton, Inc. ("First Alton").

---

[298] Klugman Tr. at 65:16-21.
[299] ELYSIUM-05315871 (Flowchart of Shah related entities).
[300] *See, e.g.*, ELYSIUM-04658774 (First Alton, Inc.); ELYSIUM-04665984 (First Alton, Inc.); ELYSIUM-04641823 (First Alton, Inc.); ELYISIUM-00008355 (First Alton, Inc.)  ELYSIUM-07724581 (India Atlantic, Inc.); ELYSIUM-09346040 (Atlantic India, Inc.); ELYSIUM-09346042 (Pacific India, Inc.); Bradley Dep. Tr. 337:12-338:8; ELYSIUM-04720545 (Lava Beach, Inc.); ELYSIUM-04724945 (Sand Dollar Beach, Inc.); ELYSIUM-04725421 (Starfish Dunes, Inc.); ELYSIUM-09228920 (Icon Beach, Inc.); Tucci Dep. Tr. 157:2-15; ELYSIUM-07792269 (Sabba Group Inc.); ELYSIUM-07792261 (Comisana, Inc.); Crescenzo Dep. Tr. 181:8-182:9.
[301] Bradley Dep. Tr. 334:24-340:7; Tucci Dep. Tr. 155:24-168:19; Crescenzo Dep. Tr. 157:13-160:16, 175:13-177:19, 182:15-185:23.  Lehman's brother also received payments for recruiting three of his friends to be participants in the Plans.  Like Tucci, Bradley, and Crescenzo, Lehman's brother did not provide any services aside from sourcing Plan participants., Lehman Tr. at 413:23 – 416:5.

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 93

245.    For Plans in which Lehman himself was the participant, Solo's records suggest that Lehman was paid 15% of the refunds paid by SKAT.[302]  In 2015, for his role in the scheme, Lehman's entities invoiced $33 million from Ganymede or other Shah-controlled entities.[303] No money from the refunds was paid to Lehman's Plans.[304]

246.    Lehman and his brother together recruited three of Lehman's brother's friends to act as participants in a total of 15 Plans.  Kevin Lehman was paid by Solo-related entities for these introductions.[305]  Kevin Lehman's entity SSM United LLC invoiced Solo-related entities approximately $9 million.[306] Solo's records show that it paid Kevin Lehman's entity SSM United LLC at least $7,000,000.[307]  Lehman also received payments for his role in setting up and acting as an "authorized trader" for yet more Plans.[308]

## 5.    Matthew Tucci

247.    Matthew Tucci established six plans for which he was the principal and recruited others to establish 21 plans.[309]  He understood that he would receive between $100,000 to $300,000 for each plan introduced by him and told his recruits that they would make between $35,000 to $100,000 for each plan they established.[310]

248.    Tucci received a first payment of between approximately $70,000 and $150,000 in 2014, and a second payment of between $4 and $6 million, approximately a year later.[311]  None of these funds were paid to Tucci's Plans or the Plans' associated LLCs; the money was

---

[302] Roger Lehman invoiced Shah related entities for approximately $33 million (see Lehman Exhibit 4024, 4025, 4027 and 4029) and the tax claims paid on the Plans for which he was listed as the beneficiary was approximately $220 million (see ELYSIUM-07846030). $33 million divided by $220 million is 15 percent. *Also, compare, e.g.,* ELYSIUM-07426784 (Ganymede payment calculation spreadsheet) *with* ELYSIUM-03847468 (February 24, 2014 First Alton invoice to Ganymede).
[303] *See* Lehman Exhibit 4024, 4025, 4027 and 4029; Lehman Dep. Tr. at 464:23 – 472:16.
[304] Lehman Dep. Tr. at 453:24 – 454:10.
[305] Lehman Dep. Tr. at 416:1-6.
[306] ELYSIUM-00000542; ELYSIUM-00008335; ELYSIUM-00008359; ELYSIUM-00008475; ELYSIUM-07777712.
[307] See ELYSIUM-04689274.
[308] *See, e.g.,* Lehman Dep. Tr. at 338:3-12, 348:21 – 349:21, 457:2 – 458:3, 480:13 – 483:6.
[309] Tucci Dep. Tr. 22:12-26:12, Exhibit 1289.
[310] Tucci Dep. Tr. 53:6-55:14; 121:16-122:8; 123:13-24; 119:3-9.
[311] Tucci Dep. Tr. 153:2-17.

transferred to his personal account and shell entity accounts established in connection with the scheme.[312]

249.    Tucci paid the others he recruited with portions of this money he had received from Solo/Ganymede.[313]  He and his wife decided how much each of the other participants received.[314]  The resulting payments ranged in size from $0 to $300,000, indicating that their allocation decisions were not based on the amount of shares each Plan purportedly owned or the amount of dividends each Plan purportedly received.

250.    Tucci later came to believe that he had been "shorted" between $2 to $2.6 million for his efforts to advance the scheme.[315]  Tucci raised the issue with Sanjay Shah, who then provided the money through a forgivable loan, paid to Tucci's entity White Sands Advisors, Inc.[316]

### 6.    Doston Bradley

251.    Doston Bradley established six plans for which he was the sole participant and recruited his family members to establish 14 plans.  Bradley received approximately $5.8 million in payments for establishing the 20 Plans for himself and his family.[317]  None of these funds were paid to Bradley's Plans or associated LLCs.[318]

252.    Bradley admitted that these transfers did not represent profits from trading on behalf of the plans but were instead payments for introducing plans into the scheme.[319]

253.    Bradley testified that he involved his parents in the scheme to provide for their retirement, but later admitted that he did not provide any of the money he received to his family members (including his parents), meaning those Plans and participants did not receive one dollar of the refund payments they were established to generate.[320]

---

[312] Tucci Dep. Tr. 185:2-17, 126:21-127:6.
[313] Tucci Dep. Tr. 125:20-127:16.
[314] Tucci Dep. Tr. 127:25-128:9.
[315] Tucci Dep. Tr. 170:11-171:20.
[316] Tucci Dep. Tr. 174:4-25; 240:1-14; ELYSIUM-09330629; JPM0000208.
[317] Bradley Dep. Tr. 276:19-277:10; 306:14-20; 307:14-309:4.
[318] Bradley Dep. Tr. 277:22-278:10; Tr. 307:3-9; 339:20-25.
[319] Bradley Dep. Tr. 309:5-13.
[320] Bradley Dep. Tr. 353:23-354:10.

CONFIDENTIAL

Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 95

254.    Bradley also received a $2 million loan from Sanjay Shah, which he claimed was for legitimate business use by his company Blackrain Inc.[321]  Bradley testified that as of his deposition on October 14, 2021, he has not repaid the loan.[322]

### 7.    Gavin Crescenzo

255.    Gavin Crescenzo established six plans for which he was the sole participant and recruited his family members to establish 12 plans (six by his brother, five by his mother, and one by his wife).  Crescenzo received approximately $1.8 to $1.9 million from Solo/Ganymede for his role.[323]  None of these payments were made to Plans established by Crescenzo or his relatives.[324]

256.    Despite their formation of 11 plans, Crescenzo did not share any of the proceeds he received with his mother or brother.[325]

### C.    Other Individuals and their Plans

257.    The Plans themselves generally received a fraction of the refund amounts claimed on their behalf.

258.    As described more fully below, I determined that—for the 15 Bellwether Plans—on average, approximately 9% of the amount of the tax refunds paid by SKAT actually ended up being retained by the Bellwether Plans (see Exhibit 4).  However, as demonstrated below, the percentages were much higher than 9% for the Plans established for the Recruiters, and much lower than 9% for Plans established for others.

259.    The Bellwether Plans can be separated into two groups, those where the plan participant was a Recruiter and therefore received a higher percentage of the tax claim (excluding the Lehman group where the Recruiters received fees by invoicing Shah related entities directly as discussed *supra*) and those where the plan participant was not a recruiter or was part of the Lehman group. The five Argre and Kaye Scholer Bellwether Plans which had a Recruiter

---

[321] Bradley Dep. Tr. 324:16-326:20; ELYSIUM-05510674; JPM00000370; JPM00000381.
[322] Bradley Dep. Tr. 326:21-327:19.
[323] Crescenzo Dep. Tr. 93:20-94:10; 179:1-6.
[324] Crescenzo Dep. Tr. 93:20-96:25; 98:5-99:121; 151:15-152:2; 156:1-23; 157:13-25; 159:20-160:5; 176:23-178:1.
[325] Crescenzo Dep. Tr. 192:12-193:3.

(van Merkernsteijn, Markowitz, or Klugman) as the plan participant received between 21 to 32 percent of the tax refunds, as shown in **Table 3** below.[326]

### Table 3 – Payments to Recruiter Plans

| Plan | Plan Participant | Purported Investments | Purported Dividends | Refunds Received | Ganymede Payments | Amount Paid to Plan | % of Refund |
|------|------------------|----------------------:|--------------------:|-----------------:|------------------:|--------------------:|------------:|
| Bernina Pension Plan | John van Merkernsteijn | $ 1,878,998,228 | $ 38,365,775 | $ 10,358,759 | $ (6,875,498) | $ 3,193,447 | 30.8% |
| RJM Capital Pension Plan | Richard Markowitz | $ 1,970,247,159 | $ 39,910,271 | $ 10,621,413 | $ (7,107,621) | $ 3,387,433 | 31.9% |
| Basalt Ventures LLC Roth 401(k) Plan | John van Merkernsteijn | $ 672,112,226 | $ 15,373,992 | $ 4,150,978 | $ (3,113,233) | $ 886,880 | 21.4% |
| STOR Capital Consulting LLC 401(k) Plan | Robert Klugman | $ 646,576,763 | $ 14,657,801 | $ 3,957,606 | $ (2,968,205) | $ 861,585 | 21.8% |
| Edgepoint Capital LLC Roth 401(k) Plan | Robert Klugman | $ 802,387,731 | $ 17,092,435 | $ 4,704,675 | $ (3,528,506) | $ 993,391 | 21.1% |

260.    Out of the remaining 10 Bellwether Plans, it appears that six of the Plans received no money from the refunds, and four received less than 2%, as shown in **Table 4** below. [327]

### Table 4 – Payments to Non-Recruiter Plans

| Plan | Plan Participant | Purported Investment | Purported Dividends | Refunds Received | Ganymede Payment | Amount Paid to Plan | % of Refund |
|------|------------------|---------------------:|--------------------:|-----------------:|-----------------:|--------------------:|------------:|
| Delvian LLC Pension Plan | Alicia Colodner | $ 2,066,790,606 | $ 44,953,257 | $ 11,923,504 | $ (7,849,298) | $ 194,203 | 1.6% |
| Loggerhead Services LLC Roth 401(k) Plan | Perry Lerner | $ 1,074,275,449 | $ 38,725,090 | $ 10,455,774 | $ (7,841,831) | $ 120,514 | 1.2% |
| Roadcraft Technologies LLC Roth 401(k) Plan | Ronald Altbach | $ 1,041,022,669 | $ 36,885,870 | $ 9,959,185 | $ (7,469,389) | $ 121,967 | 1.2% |
| The Bareroot Capital Investments LLC 401(k) Plan | David Zelman | $ 694,869,341 | $ 16,223,622 | $ 4,380,378 | $ (3,285,283) | $ 47,337 | 1.1% |
| The Costello Advisors Pension Plan | Gavin Crescenzo | $ 660,099,881 | $ 14,872,599 | $ 4,015,602 | $ (3,889,380) | $ - | 0.0% |
| The LBR Capital Pension Plan | Doston Bradley | $ 737,873,456 | $ 15,891,086 | $ 4,290,593 | $ (4,118,328) | $ - | 0.0% |
| The FWC Capital LLC Pension Plan | Roger Lehman | $ 1,183,509,081 | $ 38,830,045 | $ 10,484,112 | $ (10,275,618) | $ - | 0.0% |
| The Proper Pacific LLC 401(k) Plan | Doston Bradley | $ 783,034,148 | $ 15,995,932 | $ 4,318,902 | $ (4,150,142) | $ - | 0.0% |
| The Oaks Group Pension Plan | Matthew Tucci | $ 1,139,614,285 | $ 38,221,886 | $ 10,319,909 | $ (10,140,940) | $ - | 0.0% |
| The SVP 401(k) Plan | Svetlin Petkov | $ 610,996,178 | $ 14,097,947 | $ 3,806,446 | $ (3,689,260) | $ - | 0.0% |

261.    The distribution of proceeds illustrated above is not unique to the Bellwether Plans, rather these plans are illustrative of how each Plan under this scheme was set up: to siphon the majority of money to Shah-related entities (specifically Ganymede), with the next largest portion of money to the Recruiters (either through Partnership Payments, money funneled through Ganymede, or to their own Plans), leaving little, if any, money for the remaining Plans.  To verify this, I performed a similar analysis on a sample of the remaining 2,289 claims[328] using a sample size of 71.[329]  The sample size was determined by utilizing the following parameters:

- Population size of 2,289
- 95% level of confidence

---

[326] *See* Exhibit 4 for additional detail.

[327] *See* Exhibit 4 for additional detail.

[328] 2,289 claims equal 2,559 total claims less 270 claims related to the Bellwether Plans.

[329] Raosoft is a widely used and commonly accepted survey tool which can be accessed at www.raosoft.com.

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 97

- Response distribution of 95%

262.    I then used a random number generator to generate the final selection of the 71 refund claims to analyze to avoid bias in the selection process.

263.    The results of the sample (as shown below in **Table 5** and detailed further in Exhibit 5) confirmed that the payment structure for the Bellwether Plans is consistent throughout the Plans involved in the Solo Trades.

### Table 5 – Payment Structure for the Plans

| Group | # of Claims | Tax Refund Claims | Payment to Ganymede | Amount to Partners | Maximum Potential Amount Remaining for Plan | % of Tax Refund |
|---|---|---|---|---|---|---|
| Argre - Recruiter | 5 | $ 5,926,548 | $ (3,934,292) | $ - | $ 1,992,256 | 33.6% |
| Arge - Non-Recruiter | 12 | $ 2,690,909 | $ (1,786,715) | $ (835,108) | $ 69,086 | 2.6% |
| Kaye Scholer - Recruiter | 6 | $ 888,773 | $ (666,580) | $ - | $ 222,193 | 25.0% |
| Kaye Scholer - Non-Recruiter | 10 | $ 6,470,667 | $ (4,853,000) | $ (1,536,783) | $ 80,883 | 1.2% |
| Lehman | 38 | $ 23,230,817 | $ (22,042,289) | $ - | $ 1,188,528 | 5.1% |

264.    Consistent with my findings for the Bellwether Plans, the Argre group of Plans for which the Plan participant was a Recruiter (i.e., Markowitz and van Merkensteijn, as well as non-defendants Stein and Lhote) all received at a maximum 34% (not accounting for additional purported trading and brokerage fees), while the remaining Argre Plans received less than 3% of the total tax refund. The Kaye Scholer group of claims for which the Plan participant was Richard Markowitz or Robert Klugman all received at a maximum 25% (not accounting for additional purported trading and brokerage fees), while the remaining Kaye Scholer Plans received less than 2% of the total tax refund. The Lehman group of Plans all received on average approximately 5% of the total tax refund (not accounting for additional purported trading and brokerage fees).

265.    Consistent with my findings for the Bellwether Plans, the majority of the funds (approximately 66% to 95%) from the tax claims for the sample went to Ganymede. By extrapolating the findings of my sample (as detailed in **Exhibit 5**) to all of the claims, it is estimated that Ganymede received approximately $946 million of the tax claims filed by the Plans, as shown below in **Table 6**.

**Table 6 – Payments to Ganymede**[330]

| Group | Claim Amount (USD) | Ganymede % | Estimated Amount to Ganymede |
|---|---|---|---|
| Arge | $ 288,335,443 | 66.4% | $ 191,421,785 |
| Kaye Scholer | $ 242,949,205 | 75.0% | $ 182,211,904 |
| Lehman | $ 603,205,921 | 94.9% | $ 572,344,888 |
| **Total** | **$ 1,134,490,569** | | **$ 945,978,576** |

## VIII.  Conclusion

266.    I have concluded that:

- There is no evidence that the Plans ever owned actual shares of Danish companies resulting from the purported Solo Trades, or received actual dividends issued by the Danish companies whose shares were allegedly purchased by the Plans.

- The Solo Trades were pre-arranged, closed loop, circular transactions in which a short-seller purported to sell Danish shares to the Plans, but only obtained the non-existent shares by purportedly borrowing those same shares, either directly or indirectly, from the Plans that also did not have any shares.  In effect, in all of the 2,559 Solo Trades, a seller "sold" shares it did not have to a Plan and purported to cover that "sale" by supposedly borrowing those same shares from the Plan, which never had the shares to begin with.

- The Plans did not have sufficient capital, liquidity, or creditworthiness to execute purchases of actual shares in the amounts and volumes of the Solo Trades.

- Based on my review of Solo Custodian account statements and Plan bank records, the overwhelming majority of the "profits" received by the Plans were derived from receiving a small fraction of the dividend tax refund claim paid by SKAT, with *de minimis* (if any) profits from anything but the refunds.  Most of the proceeds from the tax reclaim payments went to Solo Capital or affiliated entities

---

[330] **Table 6** does not include the Zeta group of plans which had approximately $4.3 million of claims. The tax claims are converted into USD using an exchange rate from S&P Capital IQ. The Ganymede percentage applied is estimated based on the average percentage to Ganymede calculated for each Group in the sample, as seen in **Exhibit 5**.

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 99

or the Recruiters.

267.    This Report is based upon the information available to me and reviewed to date. I reserve
the right to supplement or amend this Report as necessary to respond to any additional
information that becomes available for my review including, but not limited to, issues raised
by experts that may be retained by the defendants in this matter.



---

Bruce G. Dubinsky, MST, CPA, CFE, CFF, MAFF, CAMS

December 31, 2021

**APPENDICES**

**APPENDIX A**

**QUALIFICATIONS OF BRUCE G. DUBINSKY**

**(As of December 2021)**





## Bruce Dubinsky

Principal

M +1 240 413 3145
E bruce.dubinsky@dubinskyconsulting.com

**Bruce G. Dubinsky**, CPA, MsT, CFF, CFE, CVA, CAMS, MAFF is the owner of Dubinsky Consulting, LLC. His practice is focused on providing dispute consulting services to a variety of clients, including law firms, corporations, governmental agencies, law enforcement bodies and self-regulatory organizations. Bruce frequently works on complex litigation cases where the claims in many instances are in the billions of dollars.

Based in South Florida, Bruce is a forensic accountant with more than 36 years of financial investigative and dispute consulting experience having worked on hundreds of complex and high-profile engagements throughout his career. He has provided testimony as an expert witness over 100 times and has testified in over 75 trials, many of which were jury trials.

Bruce has been qualified and testified as an expert witness in cases involving criminal and civil financial fraud, Ponzi schemes, SEC and FINRA enforcement actions, commercial business damages, business valuations, federal income, estate and gift taxation, GAAP, GAAS and related accounting issues as well as and bankruptcy matters. He has been employed on numerous occasions as a testifying expert for federal income tax matters by the United States Department of Justice (DOJ), Tax Division, as well as the Office of Chief Counsel for the Internal Revenue Service.

Prior to forming Dubinsky Consulting, Bruce was the managing director at Duff & Phelps, LLC, a dispute consulting firm specializing in forensic accounting, fraud investigations and commercial dispute consulting. Earlier in his career, he held leadership positions for various real estate development and public accounting firms.

Bruce earned his Master of Science in Taxation (with high honors) from Georgetown University, and his Bachelor of Science in Accounting from the University of Maryland. He is a Certified Public Accountant, Certified Fraud Examiner, Certified Anti-Money Laundering Specialist, Certified Valuation Analyst, Certified in Financial Forensics, and earned a certificate as a Master Analyst in Financial Forensics. Bruce is the Chairman Emeritus of the Association of the Certified Fraud Examiners Board of Regents.

### Areas of Expertise

- Fraud Investigations
- Forensic Accounting
- White Collar Criminal Fraud
- Complex Tax Controversy Cases
- Commercial Damage/Lost Profits Analysis
- Bankruptcy Investigations
- Investment/Securities Damages/Suitability
- Campaign Finance Compliance/ Investigations
- Post-Acquisition Disputes
- Accounting/GAAP Disputes

130 Via Florenza
Palm Beach Gardens, FL 33418

DUBINSKY CONSULTING

**Bruce Dubinsky**

## Representative Engagements

### Expert Testimony

- Hired as a testifying expert on an insider trading case by the defense for a lawyer charged with conspiracy and insider trading crimes. Testimony surrounded SEC investment matters including information that was publicly available information related to a proposed merger of two publicly traded pharmaceutical companies.

    *"I find his experience and expertise impressive and that he's qualified to testify as an expert on this issue."*

    **The Honorable Joan M. Azrack**
    **United States District Court for the Eastern District of New York**

- Hired by the United States Department of Justice as the testifying forensic accounting expert in the Madoff 5 criminal trial in the U.S.D.C. - S.D.N.Y. in 2013 to testify as to the nature of the Madoff Ponzi and the extent of the fraud in the organization.

    *"My antennas were up," says Sheila Amato, a schoolteacher who served on the jury, who remembers feeling that **some of the defendants were guilty after Dubinsky's presentation.** "But at that point, I wasn't sure if they all were."*
    **Sheila Amato, Juror- Criminal Trial USDC-SDNY– "The Madoff 5"** [1]

    **********************************

    ```
    23|Q. You plainly conducted a very extensive investigation of
    24|Madoff Securities.
    25|A. Thank you.
    64:1|Q. I meant it as a question, not a complaint.  If you take
     2|it as a complaint, that's fine.   I think it is unanimous that
     3|you were thorough, I think.  Either you or people working for
     4|you looked at millions and millions of documents, correct?
     5|A. That is correct, yes.
    ```

    *Cross Examination - Criminal Trial U.S.D.C. – S.D.N.Y*

- Hired as the testifying expert witness by the law firm of Baker & Hostetler LLP ("Baker"), counsel for Irving H. Picard, Trustee ("Trustee") for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and Bernard L. Madoff ("Madoff"), to provide forensic accounting analysis and render certain expert opinions related to the Madoff Ponzi.

---

[1] THE MADOFF FIVE: History's Greatest Fraud Yields One Of The Greatest Legal Slugfests Of Our Time, Behar, Richard, Forbes December 31, 2014, http://tinyurl.com/j6m6h9c

**DUBINSKY** CONSULTING

**Bruce Dubinsky**

- Hired by the United States Department of Justice as the testifying forensic accounting expert in the Samuel E. Wyly and Caroline D. Wyly bankruptcy cases in the U.S. Bankruptcy Court- N.D. Texas to testify regarding alleged tax fraud involving an elaborate off-shore trust and corporate structure utilized by the Wyly's for over twenty years to avoid paying federal income and gift taxes in the United States.

- Hired by the court appointed Election Monitor as the forensic investigator on campaign finance fraud for the United States Department of Justice through appointment by the U.S. District Court for the Southern District of New York for the 2015-2016 International Brotherhood of Teamsters (IBT) Union Delegate and Officer Election.

- Hired as a testifying damages expert in a case involving lost profits and damages arising from alleged trespassing and unauthorized utilization of an internet service provider network.

- Hired as a testifying expert in a case involving allegations related to a prominent real estate developer of public corruption and tax fraud in the District of Columbia.

- Hired by the United States Department of Justice as the testifying forensic accounting expert in a criminal case involving alleged tax fraud utilizing off-shore captive insurance schemes.

> *"GVI (Government of the Virgin Islands) did not demonstrate in the arbitration that the audit Recapitulation performed by Dubinsky was inappropriate or unreliable. To the contrary, the GVI's random testing of Dubinsky's audit reconciliations in cross-examination **demonstrated the reliability of Dubinsky's work product and opinions.**"*[2]

**The Honorable James T. Giles (Ret.)**
**Former Chief Judge, U.S. District Court for the Eastern District of Pennsylvania**

- Hired as a testifying expert witness in a case involving alleged international public corruption in connection with the purchase of a state owned industrial manufacturing plant.

- Hired as a testifying expert witness by AMTRAK regarding damages from Superstorm Sandy and damage sustained by the railroad.

- Hired as a testifying expert on a case arising out of the financial crisis involving alleged fraud in connection with the merger of Merrill Lynch and Bank of America, two of the largest financial institutions in the United States.

- Hired as one of the lead forensic accounting investigators who worked on the Lehman Brothers bankruptcy investigation conducted by the Special Examiner appointed by the bankruptcy trustee for the Lehman Brothers bankruptcy estate, the largest bankruptcy filing in United States history.

- Hired as a testifying forensic accounting expert for the defense in the Parmalat SpA fraud case, one of the world's largest accounting fraud cases to date. Provided expert testimony in a multi-day deposition regarding various matters including the nature of the frauds perpetrated, methods utilized by various alleged fraudsters and the underlying transactions at issue.

---

[2] John K. Dema, P.C. v. Government of the U.S. Virgin Islands, Arbitration Order, November 2016.

**DUBINSKY CONSULTING**

**Bruce Dubinsky**

*"Dee has three years of college, no business or legal experience, and was faced with a set of transactions much more complicated than the ones at issue in Reser—transactions which the IRS' expert—**a highly experienced forensic accountant**—called 'if not the most complicated, one of the most complicated cases" that he had ever investigated.' "[3]*

**The Honorable Barbara J. Houser**
**Chief Judge - In the United States Bankruptcy Court for The Northern District of Texas -Dallas Division**

- Hired by FINRA Department of Enforcement as a testifying forensic accounting expert in a case involving alleged fraud by an investment advisor.

- Hired as a testifying damages expert for the defense in a case with nearly $1 billion dollars of alleged damages for an alleged patent licensing breach of contract case involving hard disk drive spindle motors and related hard disk drive component products.

- Hired as a testifying damages expert in a case involving allegations of theft of trade secrets related to a military defense business in the United States.

- Hired as a testifying forensic accountant and damages expert in a case involving hundreds of millions of dollars of consumer credit card and debt accounts in several asset-backed securitization vehicles.

- Hired by FINRA Department of Enforcement as a testifying forensic accounting expert in a case involving alleged fraud by a broker/dealer and a related investment vehicle.

- Hired on behalf of Siemens Energy Inc. as a testifying expert on issues related to alleged damages from a contract termination in South America related to a power plant.

- Hired as a testifying forensic accountant expert in over twenty cases surrounding alleged fraudulent tax shelters involving hundreds of millions of dollars in unpaid federal income taxes.

- Hired as a testifying forensic accountant for the defense of a prominent banking lawyer in a white-collar criminal case involving allegation of bankruptcy and tax fraud.

- Hired as a testifying forensic accountant for the defense of the former Governor of Puerto Rico in a white-collar criminal case involving allegations of campaign finance fraud and tax fraud.

- Hired as a testifying damages expert in a health care insurance case involving breach of contract and other claims.

- Hired as a testifying damages expert by DuPont in a case involving lost profits arising from intentional disruption of distributorship channels.

- Hired as a testifying damages expert in a case against a mutual fund related to allegations of overcharging management fees to its retail customers.

- Hired as a testifying damages expert by a subsidiary of DuPont in a case involving the alleged sale of tainted food stabilization products to a food processing plant.

- Hired as the forensic accountant to investigate fraud allegations on behalf of the Washington Teachers' Union where the presiding officers were alleged to have embezzled millions of dollars from union coffers.

[3] IN RE: SAMUEL EVANS WYLY, et al. US Bankrupcty Court- Northern District Dallas Case No. 14-35043-BJH.

130 Via Florenza
Palm Beach Gardens, FL 33418