# Exhibit 46, Part 1 of 6

# LIONBRIDGE

STATE OF NEW YORK     )
                            )
                            )     ss
COUNTY OF NEW YORK   )

## CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true

and accurate translation from Danish into English of the attached letter from The Danish Tax

Appeals Agency, dated June 26, 2020. I affirm that the linguist responsible for producing this

translation is fluent in both the Danish and English languages.

_____

Lynda Green, Senior Managing Editor
Lionbridge

Sworn to and subscribed before me

this _4th_ day of _June_ , 20 _22_ .

ETHAN WIN LY
NOTARY PUBLIC-STATE OF NEW YORK
No. 01LY6323702
Qualified in New York County
My Commission Expires 04-27-2023

_____

Advokatfirmaet Poul Schmith, Kammeradvokaten I/S Vester
Farimagsgade 23
1606 Copenhagen
V Denmark
Attn: Steffen Svaerke

**Contact**
Send mail to the Danish Tax
Appeals Agency here

Telephone                33760909

**Case Worker**
Oliver Asbjørn Evers
Direct Telephone         33762411

Our Case No.             18-0004185

Your Case No.            4000809
SS/ISA/CBRO

June 26, 2020

**Mail from the Danish Tax Appeals Agency**

You are hereby sent a copy of a letter from the Danish Tax Appeals Agency.

Please refer to the Danish Tax Appeals Agency's case number if you contact us about this
letter.

Yours sincerely,

The Danish Tax Appeals Agency

VAT No 10 24 28 94
www.skatteankestyrelsen.dk

1/1

The Proper Pacific LLC 401k Plan
31W 21 ST Street Apt 2N
NY 10010 New York
United States of America (USA)

**Contact**

Send mail to the Danish
Tax Appeals Agency here

Telephone 33760909

**Case Worker**

Oliver Asbjørn Evers

Direct Telephone
33762411

Our Case No.18-0004185

June 26, 2020

**Decision**

An appeal has been filed against the Danish Tax Agency's decision dated 04/06/2018 for The
Proper Pacific LLC 401k Plan, ID No 20630. The National Tax Tribunal has now ruled on the case.
The decision is attached.

**Guidelines for proceedings**

The decision may be appealed within 3 months of the date of the decision. The rules on judicial
review are set out in §§ 48-49 of the Danish Tax Administration Act.

The case must be brought before the district court where the taxpayer is domiciled. The action is
brought against the Ministry of Taxation, Nicolai Eigtveds Gade 28, 1402 Copenhagen K. The
detailed guidance on bringing an action is available at www.domstol.dk.

Best regards

Malene Bregnhøj

VAT No 10 24 28 94

www.skatteankestyrelsen.dk

1/1

**Decision**

**from**

**The Danish National Tax Tribunal**

June 26, 2020

Case No. 18-0004185

Participants in the decision:   Eline Ringgaard Kjeldsen, Bodil Toftemann and Poul Erik Nielsen

Appellant                    The Proper Pacific LLC 401k Plan

Matter being appealed:       Danish Tax Agency's decision of 04/06/2018

Persona/Corporate ID No.:    20630

The Danish Tax Agency has revoked an earlier decision on the reimbursement of dividend tax. The National Tax Tribunal

upholds Danish Tax Agency's decision.

**Meeting etc.**
A meeting was held with the representative of the Proper Pacific LLC 401k Plan (hereinafter the Pension Plan).

**Factual information**
The pension plan, established in September 2014, is registered as a pension fund in the United States.

The pension plan is established by a U.S. limited liability company (LLC) for the benefit of the company's employees. A U.S. pension plan established by an employer for the benefit of one or more employees cannot be self-administered. Nor may the employer administer the pension plan. A trust acts as trustee through a person entitled to subscribe, known as a trustee.

By requests dated April 20, April 21, April 27, and May 15, 2015, an agent on behalf of the Pension Plan requested a reimbursement of dividend taxes of $29,035,888.
The Danish Tax Agency has obtained information on the Pension Plan from the U.S. tax authorities, Department of the Treasury, Internal Revenue Service (hereinafter IRS). This information shows:

- That the Pension Plan is a newly established pension fund.
- That the annual contribution to the pension fund is limited to between USD 12,500 and USD 53,000 per participant depending on the age of the contributor.
- That the Pension Plan failed to file FORM 5500, thereby representing to the IRS that its assets at year-end 2014 and 2015 were less than $250,000.

Assuming that the Pension Plan must own the stocks at the time of the General Meeting (the day before the ex-date), the acquisition cost of the Pension Plan's purchase of the stocks indicated in the request is calculated on the basis of the closing price on the last trading day before the ex-date:

| Danish Tax Agency bundle no. | Stock | Date of rate | Amount | Exchange rate | Calculated acquisition cost in DKK |
|---|---|---|---|---|---|
| 35015 | CHR. Hansen Holding A/S | 11-27-2014 | 839,500 | 258,90 | 217,346,550 |
| 35015 | Coloplast A/S – B | 12-04-2014 | 930,208 | 527,00 | 490,219,616 |
| 39015 | Novozymes A/S B | 02-25-2015 | 683,931 | 322,50 | 220,567,748 |
| 39015 | TDC A/S | 03-05-2015 | 3,293,727 | 54,00 | 177,861,258 |
| 39015 | DSV A/S | 03-12-2015 | 692,422 | 219,20 | 151,778,875 |
| 39015 | Pandora A/S | 03-18-2015 | 400,364 | 614,50 | 246,023,678 |
| 39015 | Danske Bank A/S | 03-18-2015 | 2,906,712 | 175,30 | 509,546,614 |
| 35215 | Novo Nordisk A/S B | 03-19-2015 | 6,634,763 | 341,90 | 2,268,425,470 |
| 39015 | Gn Store Nord A/S | 03-19-2015 | 622,804 | 154,20 | 96,036,377 |
| 39015 | Tryg A/S | 03-25-2015 | 34,813 | 868,50 | 30,235,091 |
| 39015 | FL Smidth & CO A/S | 03-26-2015 | 81,037 | 314,00 | 25,445,618 |
| 39015 | Carlsberg A/S – B | 03-26-2015 | 180,313 | 571,50 | 103,048,880 |
| 35215 | A.P. Møller Mærsk A/S A | 0330--2015 | 7,879 | 15,810,00 | 124,566,990 |
| 35215 | A.P. Møller Mærsk A/S B | 03-30-2015 | 8,083 | 16,410,00 | 132,642,030 |
| 39015 | Vestas Wind Systems A/S | 03-30-2015 | 377,809 | 290,20 | 109,640,164 |
| 40115 | Coloplast A/S – B | 05-06-2015 | 294,370 | 510,00 | 150,128,700 |

In 2015, the Danish Tax Agency paid a reimbursement of dividend tax to the Pension Plan pursuant to a request from the Pension Plan's agent, Goal Taxback Limited:

| Danish Tax Agency bundle no. | Date of maturation | Stock | Amount | Ex-date *) | Dividend total DKK | Dividend tax refund |
|---|---|---|---|---|---|---|
| 35015 | 04/20/2015 | CHR. Hansen Holding A/S | 839,500 | 11/28/2014 | 3,164,915 | 854,527 |
| 35015 | 04/20/2015 | Coloplast A/S – B | 930,208 | 12/05/2014 | 6,976,560 | 1,883,671 |
| 35215 | 04/21/2015 | A.P. Møller Maersk A/S A | 7,879 | 03/31/2015 | 15,529,509 | 4,192,967 |
| 35215 | 04/21/2015 | A.P. Møller Mærsk A/S B | 8,083 | 03/31/2015 | 15,931,593 | 4,301,530 |
| 35215 | 04/21/2015 | Novo Nordisk A/S B | 6,634,763 | 03/20/2015 | 33,173,815 | 8,956,930 |
| 39015 | 04/27/2015 | Novozymes A/S B | 683,931 | 02/26/2015 | 2,051,793 | 553,984 |
| 39015 | 04/27/2015 | Vestas Wind Systems A/S | 377,809 | 03/31/2015 | 1,473,455 | 397,832 |
| 39015 | 04/27/2015 | TDC A/S | 3,293,727 | 03/06/2015 | 3,293,727 | 889,306 |
| 39015 | 04/27/2015 | Gn Store Nord A/S | 622,804 | 03/20/2015 | 560,523 | 151,341 |
| 39015 | 04/27/2015 | Tryg A/S | 34,813 | 03/26/2015 | 1,009,577 | 272,585 |
| 39015 | 04/27/2015 | Pandora A/S | 400,364 | 03/19/2015 | 3,603,276 | 972,884 |
| 39015 | 04/27/2015 | FL Smidth & CO A/S | 81,037 | 03/27/2015 | 729,333 | 196,919 |

| 39015 | 04/27/2015 | DSV A/S | 692.422 | 03/13/2015 | 1,107,875 | 299,126 |
|---|---|---|---|---|---|---|
| 39015 | 04/27/2015 | Carlsberg A/S – B | 180,313 | 03/27/2015 | 1,622,817 | 438,160 |
| 39015 | 04/27/2015 | Danske Bank A/S | 2,906,712 | 03/19/2015 | 15,986,916 | 4,316,467 |
| 40115 | 05/15/2015 | Coloplast A/S – B | 294,370 | 05/07/2015 | 1,324,665 | 357,659 |
| Total | | | | | 107,540,349 | 29,035,888 |

*) The date on which a stock ceases to be traded with dividend rights

The request was accompanied by the following appendices:

1. Form 06.003 ENG – Claim to Relief from Danish Dividend Tax.
2. Credit Advices.
3. FORM 6166 from IRS – Certificate of resident in USA (issued by IRS).
4. Power of Attorney to Goal Taxback Limited.

Re: 1. Form 06.003 declares that the Pension Plan is the legal owner of the stocks and is covered by the Double Taxation Convention between Denmark and the United States.

Re: 2. Credit advices prepared by custodian Old Park Lane Capital PLC or Telesto Markets LLP as evidence of the Pension Plan's ownership of the stocks and receipt of dividends from the stocks.

Re: 3. Certificate evidencing that an individual or corporation is domiciled in the United States for U.S. tax purposes.

Re: 4. Authorization to the agent of the Pension Plan to submit the request for reimbursement of withholding tax.

All stocks in Danish listed companies are registered with VP Securities, the Danish central securities depository.

This registration includes a securities account in a Danish bank set up in the name of a stockholder. A securities account contains the stockholder's holdings of stocks, which may consist of stocks in various Danish listed companies. Stocks in listed companies may be registered as held by, for example, banks that have one common securities account for their customers (called an omnibus securities account). The bank will be registered with VP Securities as the owner, even if it is a client who actually owns the stockholding. Omnibus securities accounts are registered with the nationality/address of the securities account holder (typically the bank) – without knowledge of the nationality of the underlying owner.

A search of information provided by VP Securities did not reveal any securities account held with a Danish bank of which the Pension Plan or its custodian, Old Park Lane Capital PLC or Telesto Markets LLP, is the registered owner.

The Danish Tax Agency has obtained information from the IRS, which has attached Instructions for FORM 5500-EZ in a letter dated June 13, 2016, which states:

"Who Does Not Have To File FORM 5500-EZ

You do not have to file FORM 5500-EZ for the 2015 plan year for a one-participant plan if the total of the plan's assets of all other one-participant plans maintained by the employer at the end of the 2015 plan year does not exceed $250,000, unless 2015 is the final plan year of the plan. For more information on final plan years, see Final Return later."

Based on information provided by the IRS, it is the Danish Tax Agency's assessment that this is a "One-Participant (Owners and Their Spouses) Retirement Plan."

For general questions about retirement plans and contributions to them, the IRS has provided links to the IRS website on "Topics for Retirement Plans." The website states, among other things:

-    That a One-Participant 401(k) plan covers a business owner with no employees other than the person and any of his or her immediate family.
-    That the annual deposit is limited to between USD 12,500 and USD 53,000 depending on the age of the depositor (limited to a maximum of USD 53,000, however USD 59,000 for participants aged over 55).

The Danish Tax Agency has based on information from the IRS:

-    That if a pension plan does not file FORM 5500, the pension plan is indicating that it is a One-Participant Retirement Plan with assets of less than $250,000.
-    That if a tax-exempt retirement plan operates a business (Unrelated Business Income), it must pay taxes on the income therefrom and a Form 990-T must be filed with the IRS.
-    That if a tax-exempt retirement plan has Dept-financed Income, tax must be paid on the income therefrom and a Form 990-T must be filed with the IRS.
-    That if a pension plan distributes funds, this must be reported to the IRS on a Form 1099, stating how much was paid out and to whom. The person who received the funds is taxable on the income and must file a tax return.

The IRS indicated in a letter dated December 13, 2016, that it does not have tax returns (FORM 5500) for the pension plan because no tax returns were filed for 2014 or 2015.

The Pension Plan representative has indicated that the stocks were purchased shortly before the dividend date and that the Pension Plan entered into a contractual agreement for payment after the dividend date. After receiving the dividend, the Pension Plan lent the stocks to third parties. The borrower had to provide cash collateral which the Pension Plan could use to pay for the stocks at the time of settlement for the acquisition of the stocks.

The representative of the pension plan has stated that its investment strategy aims at realizing a profit by exploiting the price difference on the spot and forward market, which consists of three components: a stock purchase, a derivative transaction (a forward) and a stock lending transaction. The actors in these three transactions include:

"
1    An American pension plan (which becomes the owner of the Danish stocks)
2    A trader (a trustee who places all orders for all transactions)

3      An execution broker, who acts as a legal counterparty to the buyers and sellers, carrying out owner-matching transactions

4      A clearing agent who receives settlement instructions after a trade has been concluded and the contract is therefore final

5      A custodian who registers the ownership of the stocks as sub-custodian and thereby holds the stocks for the pension plan

6      A forward intermediary (the legal counterparty to the forward hedge)

7      A stock loan intermediary. The pension plans do not know who the final stock lender was, as the intermediary not only arranges a stock loan, but also enters into the contracts as borrower or lender

8      Tax agents (who submit the reimbursement applications)

9      Introducing broker (a contact person who introduces clients to the various financial institutions for a fee)

10     An "arranger" (an agent with exclusive access to certain networks, companies or business concepts (intellectual property rights))."

The pension plan representative among other things also stated:

'Apart from the pension plan, which would realize an arbitrage gain from the transactions, the sole motivation of all the other actors to carry out the transactions was to earn their respective fees in the performance of their respective tasks.

As the pension plan's profit was already secured when the forward contract was concluded, all the operators could be sure that they would receive the required fee. It was only when the gain between the stock purchase and the forward contract had been used up and the dividend reimbursement had still not been received that the service providers ran the risk of not being paid (in the event that the reimbursement would not be paid), as the pension scheme would then be in a loss-making situation. This was therefore the limit for how long the pension scheme could keep the positions open."

The pension plan representative described a trade as follows:

"Any arbitrage investment consists of a series of sequential events beginning with the opening of a position followed by its closing, whereby such a position consists of three parts: a stock trade (a stock position is opened and closed, *i.e.*, the stocks are bought and sold), a forward contract (which is opened and closed) and a stock loan (the loan is made and repaid). In addition to these trading transactions, a net dividend and a reimbursement of withholding tax are received. However, the latter are intended only to cover part of the loss in the price of the stock, which takes place on the ex-date.

To open or close a position, exactly the same actions are performed as are documented for the emails presented.

The economic gain realized from an arbitrage transaction can be considered in different ways:

One way is to compare the economic outcome of the equity trade itself (opening and closing the equity position) in isolation from the forward contract (its opening and closing), as done in the example below. Another way is to compare the economic outcome between the equity and forward trade when these two positions are opened and closed.

While the figures used in both scenarios are the same, the economic conclusions drawn are different, as the gain from aggregating both transactions is realized when the positions are opened (when the stocks are bought and the forward contract is concluded), rather than when the positions are closed on the last day of the investment. The arbitrage gain is not included in the dividend tax reimbursement. The gain is simply a similar amount. The pension fund, which paid 100 % of the value of the stocks before the ex-date, also paid for the gross dividend with the purchase price. However, the pension plan received only the net proceeds. The pension plan had thus paid the dividend tax when the stocks were acquired. The final gain (including the reimbursement of the dividend tax) is not the same as the dividend tax. It is higher if the pension plan does not use the entire profit from the arbitrage transaction to keep the stock loan open.

The arbitrage gain, which can be identified and thus retained (booked as unrealized gain) already when the stocks are purchased and the forward contract is concluded on the first day of the transaction, is shown in the statements (cash ledgers) prepared by Schaffelhuber Müller & Kollegen S.a.r.l."

The pension plan representative described a stock arbitrage transaction with an example at the office meeting as follows:

*"Purchase/sale of stocks and forward contract*
On November 27, 2014, the pension plan issued a purchase order for 839,500 CHR Hansen Holding A/S stocks at a price of DKK 258.9 per stock, totaling DKK 217,346,550.00. Payment, delivery of stocks and registration were scheduled for December 2, 2014 (settlement).

On November 27, 2014, the pension plan also entered into a forward contract (a financial contract) for the sale of 839,500 CHR Hansen Holding A/S stocks at a price of DKK 256 per stock for settlement on March 20, 2015.

On December 16, 2014, the pension plan entered into a new forward contract with the same settlement date, March 20, 2015, for the purchase of 839,500 CHR Hansen Holding A/S stocks at a price of DKK 261.22. They therefore closed the open position and had a loss on the forward of DKK -4.80 per stock.

On December 16, 2014, the pension plan sold the stocks at a price of DKK 261 per stock, totaling DKK 219,109,500. The pension plan thus had a net gain of DKK 2.10 per stock, totaling DKK 1,762,950.

The stock trades and forward contracts resulted in a total loss of DKK -2.70 per stock, for a total loss of DKK – 2,266,650.

*Stock Lending*
On December 01, 2014, the pension plan issued an order for settlement on December 2, 2014 to lend 839,500 CHR Hansen Holding A/S stocks at a price of DKK 258.90 per stock, totaling DKK 217,346,550, against collateral of cash payment of the amount. The pension plan thus received DKK 217,346,550 as security for the return of the stocks.

The stock loan was terminated on December 16, 2014, with an effective date of December 18, 2014. This had the consequence that the stocks had to be returned. The stocks then (on December 16, 2014) had a market value of DKK 261 per stock, totaling DKK 219,109,500.

This amount plus the total amount of the current valuation adjustment, MTM, which amounted to DKK -1 762 950 had to be repaid to the stock borrower, totaling DKK 217 346 550.

The stock borrower was thus guaranteed to receive the full amount he had given as cash collateral for the stock loan.

In addition, the pension plan had to pay interest on the stock loan of DKK 67,618.93 and receive a fee for the stock loan of DKK 23,880.98, in total paying -DKK 43,737.95.

*Dividend – Reimbursement payment and reimbursement*
Pay day, the day on which the dividend is paid, was December 02, 2014.

The dividend had been approved at the Annual General Meeting on November 27, 2014. The pension plan received compensation for the net dividend.

On the record day (December 1, 2014), the pension plans were not yet registered as owners of the stocks, as the settlement of the purchase did not take place until December 2, 2014.

VP therefore paid the dividend to the former owner, who was registered as the owner of the stock with VP on December 1, 2014.

Under the so-called "market claim process," the seller's custodian is required to debit the proceeds from the seller and credit the proceeds to the buyer (or forward the proceeds to the buyer's custodian so that he can credit the buyer's account).

The gross dividend paid by CHR Hansen Holding A/S was DKK 3.77 per stock, totaling DKK 3,164,915 for the pension plan stocks.

The net dividend amounted to DKK 2,310,387.95 and the dividend tax to DKK 854,527.05."

The representative provided an example of the Pension Plan's stock transactions:

**The Proper Pacific LLC 401k Plan**
**2014 CHR HANSEN HOLDING A/S**

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| | Date | Type | Description | Credit | Debit | Balance |
| 1 | 01. Jan 14 | | Opening Balance | | | |
| 2 | 27. Nov 14 | Equity | Buy 839.500 CHR HANSEN HOLDING A/S @ 258,9 DKK | | -217.346.550,00 | -217.346.550,00 |
| 3 | 27. Nov 14 | Forward | Sell 839.500 CHR HANSEN HOLDING A/S @ 256,42 DKK  EXPIRES 20.Mär 15 | | | -217.346.550,00 |
| 4 | 27. Nov 14 | Trading Fee | Bastion Capital Broker Invoice | | -2.716,83 | -217.349.266,83 |
| 5 | 28. Nov 14 | Dividend | CASH DIVIDEND CHR HANSEN HOLDING A/S  PD 02.Dez 14 | 2.310.387,95 | | -215.038.878,88 |
| 6 | 01. Dez 14 | Stock Loan | Lend 839.500 CHR HANSEN HOLDING A/S @ 258,9 DKK | 217.346.550,00 | | 2.307.671,12 |
| 7 | 01. Dez 14 | Trading Fee | Trading Fees USD 624,70 @ 0,1676 | | -3.727,33 | 2.303.943,79 |
| 8 | 16. Dez 14 | Equity | Sell 839.500 CHR HANSEN HOLDING A/S @ 261 DKK | 219.109.500,00 | | 221.413.443,79 |
| 9 | 16. Dez 14 | Forward | Sell 839.500 CHR HANSEN HOLDING A/S @ 261,22 DKK  EXPIRES 20.Mär 15 | | -4.029.600,00 | 217.383.843,79 |
| 10 | 16. Dez 14 | Stock Loan | Recall 839.500 CHR HANSEN HOLDING A/S @ 261 DKK | | -219.109.500,00 | -1.725.656,21 |
| 11 | 16. Dez 14 | Stock Loan | Stockloan MTM Realized | 1.762.950,00 | | 37.293,79 |
| 12 | 16. Dez 14 | Stock Loan | Stocklending Fee | | -43.737,95 | -6.444,16 |
| 13 | 16. Dez 14 | Trading Fee | Bastion Capital Broker Invoice | | -2.738,87 | -9.183,03 |
| 14 | 16. Dez 14 | Trading Fee | Trading Fees USD 4.396,91 @ 0,1681 | | -26.156,51 | -35.339,54 |
| 15 | 31. Dez 14 | Platform Fee | OPL TAS Platform Fee - December 14 USD 1.814,70 @ 0,1625 | | -11.167,38 | -46.506,93 |
| 16 | 22. Mai 15 | Dividend | Tax Reclaim CHR HANSEN HOLDING A/S | 854.527,05 | | 808.020,12 |
| 17 | 22. Mai 15 | Dividend | Goal Group Fee | | -8.545,27 | 799.474,85 |
| 18 | 31. Dez 15 | | Closing Balance | | | 799.474,85 |

*Exchange rates are based on closing price of the date or last available closing price

"

The pension plan representative has explained the individual steps for the complete implementation of a trade as follows:

"

    1  Order to buy stocks placed by e-mail

    2  The clearing agent's commitment to the stock purchase (which indirectly means a guarantee for the settlement and payment of the stocks in the clearing agent's capacity as prime broker) – this was also done by e-mail

    3  Matching of the purchase order and thereby the conclusion of a binding agreement on the purchase of the stocks was confirmed by the broker by e-mail

    4  Invoice from the broker was received by e-mail

    5  A broker confirmation (trade note) was received by e-mail

    6  Order to sell stocks through a forward contract was placed by e-mail

    7  Confirmation of the forward contract was received by e-mail

    8  Order for stock lending was placed by e-mail

    9  Confirmation of stock lending was received by e-mail

    10 Order to sell the stocks was given by the pension plan by e-mail

    11 The fund broker confirmed the execution of the sale by e-mail

    12 Order to buy back the forward contact was given by e-mail

    13 Confirmation regarding the repurchase of the forward contract was received by email

    14 The stock lending was recalled by e-mail

    15 The cancellation of the stock loan was confirmed by e-mail."

The representative of the pension plan presented a number of general and specific appendices. The following are examined in detail:

    1.  Retirement Plan Account Opening Procedure dated September 26, 2014 signed by Doston Bradley.

    2.  Certification of Trust signed on September 26, 2014 by Trustee Doston Bradley on behalf of Pacific India LLC.

    3.  Trust Agreement dated September 26, 2014 between Pacific India LLC and Trustee Doston Bradley.

    4.  Custody Agreement is not presented in the case. Only the "Terms and conditions for custody services" have been submitted.

5.  Various Global Master Securities Lending Agreements (GMSLAs) entered into between British Virgin Islands and Cayman Islands sellers (Party A), and DB4 Investment Trust (Party B). The agreements are undated.

The agreements are described as a framework agreement for use in the Pension Plan's stock lending.

The pension plan representative has stated that short selling, which according to the FSA's own definition means the sale of a stock that the seller does not own at the time of the sale, as opposed to an ordinary securities trade where the seller owns the security being sold, is not regulated in Denmark with the exception of the rules prohibiting uncovered short selling and some flagging rules.

The representative has also stated:

"It is internationally recognized that a short seller is considered covered if he simply has a framework stock loan agreement in place at the time he sells the stocks he does not own. Such a framework agreement is a GMSLA. A person who wishes to sell stocks he does not own simply needs to ensure that he can deliver the stocks at the point of delivery by means of a stock loan framework agreement. The short seller does not have to enter into a specific agreement to borrow a certain number of stocks before the sale is made, as postulated by the Danish Tax Agency in its submission of May 9, 2019, as such an agreement would make the short seller the civil law owner of the stock. He would thus no longer be a short seller at all, but a "long owner seller." Short selling can therefore (legally) only occur in the form of sales under stock loan framework agreements.

As a short seller only needs to be covered by entering into a framework agreement for stock lending, short selling has the consequence that a short seller increases the number of stocks traded and thus the number of stocks for which final and binding purchase agreements are entered into. All purchasers of these stocks become, under the general rules of the law of obligations, the owners of the stocks acquired.

No one can distinguish between stocks sold by a short seller and stocks sold by a real stockholder ("long owner"). The number of stocks available for trading (*i.e.,* free float) thus increases (temporarily) in the case of short selling to a number exceeding 100 percent of the issued stocks. It is only at the settlement of the stock dealers that this excess number of stocks in trading is brought back to the actual number of stocks issued by the company. The total amount of dematerialized stocks will always be correct at the time of settlement, when the short seller has to sell the stocks sold, by drawing stocks under the stock loan or making a covering purchase on the market.

It is thus possible that more Danish stocks are traded on the market than the number originally issued by the companies. "Short selling has precisely the typical (and also often desired) consequence that more stocks are available on the market than were originally issued."

6.  Tax Opinion dated June 27, 2012 issued by Hannes Snellman Advokatpartnerselskab at the request of Solo Capital (Dubai) Limited.

7.  Custody Statement for the Pension Plan for the period January 01–December 31, 2015.

The pension plan representative has stated that the Custody Statement shows stock purchases and sales as well as loan transactions and forward transactions. "Custody statements therefore show all transactions relating to stock positions. The dividend distribution was obviously not booked to the stock accounts, but to a cash account. This cash account could be viewed online by the pension plans on a regular basis. Since none of the pension plans whose cases were selected as lead cases printed these cash accounts in paper form, we were unable to provide these pages."

8.  Equity Forward Transaction. Several similar agreements have been concluded. For example, on  March 6, 2015, an agreement was entered into between Gartside Global Ltd, British Virgin Islands, and the Pension Plan for the sale by the Pension Plan of forwards relating to stocks in TDC A/S, and an agreement was entered into on May 28, 2015 between Gartside Global Ltd, British Virgin Islands, and the Pension Plan for the purchase by the Pension Plan of forwards relating to the same stocks. The agreements were signed by Authorized Trader Matthew Tucci on behalf of the Pension Plan.

9.  Trading note from Bastion Capital London Ltd for the purchase of stocks and invoices for brokerage from the same companies for the purchase of stocks.

10.  Various e-mails which, according to the Pension Plan representative, document orders for the purchase of stocks, the sale of stocks, for stock lending, the purchase of forwards, etc., see above regarding documentation for the complete execution of the transaction.

On August 28, 2017, the Danish Tax Agency requested the Public Prosecutor for Special Economic and International Crime (SØIK) to:

•  To confirm or deny that the Pension Plan has received the dividends in question.
•  To state whether the material seized includes custody statements from financial institutions showing custody holdings of the pension fund.

On November 23, 2017, SØIK partially granted the Danish Tax Agency's request and replied to 66 specific pension plans:

"In response to the Danish Tax Agency's enquiries, SØIK can state that, as a general rule, information from a pending criminal prosecution is not disclosed to parties outside the criminal proceedings.
The reasons for this are given below in relation to the specific request for disclosure of information from the pending criminal investigation.
However, in view of the exceptional nature of the case and the Danish Tax Agency's special need to receive information for the purposes of the pending tax proceedings, SØIK considers that it can provide the following information without prejudice to the investigation:

Regarding 1.
On the basis of the investigation conducted so far, SØIK cannot confirm that the U.S. pension plans mentioned in the above e-mails have received stock dividends as a result of holding Danish stocks.

Regarding 2.
Based on the investigation conducted so far, SØIK cannot confirm that the pension plans mentioned in the above e-mails have held Danish stocks. Nor has VP-Securities A/S received any information on the ownership of stocks which, on the basis available could confirm that the pension plans in question held Danish stocks.

**The Danish Tax Agency's decision**
On April 6, 2018, the Danish Tax Agency revoked previous decisions on the reimbursement of dividend taxes. The reasons given

are as follows:

"The Danish Tax Agency has in the past decided on dividend tax refunds to The Proper Pacific LLC 401K Plan (hereinafter The Proper). The payments relate to the following dividend tax reimbursement requests received by the Danish Tax Agency from Goal Taxback Limited on behalf of The Proper:
...
The Danish Tax Agency's previous decisions on reimbursement of dividend taxes totaling DKK 29,035,888 to The Proper are revoked, as The Proper has not been entitled to receive the amounts.

This is the Danish Tax Agency's assessment:
- That The Proper does not own or have owned the stocks set forth in the requests.
- That the dividends in respect of the stocks shown in the applications have not been received by The Proper.

Furthermore, it is the Danish Tax Agency's assessment that The Proper has not had the capital to finance the investments in Danish stocks that are the basis for the dividend tax reimbursement requests.

In its assessment, the Danish Tax Agency has emphasized that The Proper has not provided any evidence that The Proper has owned the stocks. Nor has The Proper provided any evidence that the pension fund has received dividends on the stocks. The information in the case does not provide a basis for such significant investments in Danish stocks.

The Danish Tax Agency has emphasized:
- At The Proper is a newly founded pension fund.
- That The Proper has only a single participant with the resulting limited deposit amounts.
- That The Proper has not filed Form 5500 in the United States, therefore it must be assumed that The Proper's net worth was less than USD 250,000 at the end of the relevant tax years.
- That SØIK cannot, on the basis of the investigation conducted so far, confirm that The Proper has held Danish stocks or has received stock dividends as a result of holding Danish stocks.

On the basis of the information now available, it is the Danish Tax Agency's assessment that The Proper has not had the financial means to own stocks to the extent indicated in The Proper's applications for reimbursement of Danish dividend tax. This is shown, for example, by,

- That within 3 months of its foundation, The Proper had invested DKK 217,346,550 in the CHR stock. Hansen Holding A/S.

- That on March 19, 2015, The Proper was the owner of stocks in Novo Nordisk A/S with a total value of DKK 2,268,425,470.

Therefore, The Proper has not demonstrated that The Proper qualifies for a reimbursement of withholding taxes on Danish stocks under Article 10 of the Double Taxation Treaty between Denmark and the United States.

The Proper's representative, Advokatfirmaet TVC, has not provided any information or evidence with their objections to the Danish Tax Agency's proposal of March 24, 2017 that The Proper has owned the stocks and received the stock dividends according to the requests.

The Danish Tax Agency's decisions to reimburse dividend tax to The Proper are therefore wrongly based. The Danish Tax Agency therefore revokes the previous decisions on the reimbursement of dividend tax.

By this decision, the Danish Tax Agency does not collect the unjustified reimbursement of dividend tax. This is a change from the Danish Tax Agency's previous proposed ruling of March 24, 2017 to The Proper. On behalf of the Danish Tax Agency, the Advocate General will send a demand letter in which the Danish Tax Agency will claim repayment and compensation from The Proper.
...."

**The appellant's view**

The pension plan representative has requested that the Danish Tax Agency's decision of April 6, 2018 be annulled.

In support of the action, it is submitted that there are no grounds for challenging the Danish Tax Agency's earlier decision on the reimbursement of dividend tax, since there are no grounds for challenging the (tax) ownership of the stocks in question, as the Danish Tax Agency claims.

Furthermore, it is submitted that the Danish Tax Agency's decision of April 6, 2018 should be annulled, so that the previous decision on the reimbursement of dividend tax stands, while leaving it to the Danish Tax Agency to carry out the necessary full investigations into the matter.

The representative further stated:

**"1 No basis for contesting the ownership of the stocks**
In general, it is submitted that there is no basis for disputing the tax ownership of the stocks in question, as claimed by the Danish Tax Agency.

**1.1 Lack of capital**

First, it is disputed that The Proper Pacific LLC 401K Plan (as claimed by the Danish Tax Agency) did not have the financial means to acquire the stocks from which dividends were paid and subsequently claimed back.

In this context, it should be noted that a buyer of stocks (*i.e.,* here the pension fund) has numerous possibilities to obtain financing for the purchase of stocks in today's global financial markets without using equity. In addition to traditional debt financing, there are several other financial instruments that can be used to obtain the necessary financing to acquire beneficial ownership or legal title, and in the case at hand, legal (fiscal) ownership of the stocks.

The various players in the financial sector offer a wide range of financial products and derivatives that provide immediate access to liquidity (cash flow) for the payment of securities at the time of delivery. The motivation for investors to sell liquidity in the form of such standard instruments is to limit the use of their own funds (equity as opposed to cash) to increase the expected return on their assets. The buyer of stocks would rather use external sources of liquidity than use own funds.

For example, liquidity or cash flow to pay for the delivery of the stocks can be generated by carrying out various derivative transactions, such as issuing a deep in the money call option or a prepaid performance contract over securities.

Investors can also obtain liquidity by using Prime Broker Facilities for Securities Lending (including Repo-Pools) and Intraday-Liquidity-Facilities, which provide access to same-day funding ("just-in-case" or "back-up" facilities).

Providing their clients with access to liquidity is an important part of any stock-broker's or investment manager's standard service. This service – similar to prime broking for institutional clients – is due to the fact that interest rates are negative today. The primary motivation is to offer free money as an incentive to invest. A stockholder can use its own assets, including stocks, to provide liquidity by pledging them as collateral for liquidity facilities.
This will provide the stockholder with a very substantial liquidity facility. Such an "intra-day liquidity facility" would only be used if there were insufficient liquidity at the time of delivery of the stocks (delivery versus payment).

A so-called "Global Master Securities Lending Agreement" (GMSLA), which is the "market standard" for the contracts offered by prime brokers, is usually executed as an integral part of the account opening procedure between the client and the broker, even before any orders to buy stocks are placed. A broker will know under a GMSLA that his client has access to liquidity for the payment of the stocks already on the date the purchase contract is concluded (which is three business days prior to delivery), as the client can lend his stocks to a third party for an indefinite period of time and receive up to 100 percent of their respective price in cash.
This means that each purchase of stocks will generate the necessary liquidity to finance the continued holding of the stocks after their purchase, as the buyer can raise sufficient liquidity to pay for the purchase by lending its stocks to a third party.
In other words: The stock borrower, who would use the stocks (which in this example belonged to the pension fund) after the dividend date, provided security for this stock loan in the form of cash (which was deposited in the pension fund accounts) for the duration of the stock loan.

The Danish Tax Agency states in the present decision that The Proper Pacific LLC 401K Plan did not have the capital to acquire the stocks from which dividends were paid and for which dividend tax reimbursements were sought. The Danish Tax Agency thereby overlooks the fact that the size of a legal entity's capital does not limit its ability to acquire assets, including stocks, since the financial resources for such acquisitions can easily be obtained by other means. The decisive factor in determining whether a given legal entity can acquire stocks and other assets is whether the necessary liquidity can be provided (by substitution of own funds). Therefore, it is not correct as assumed by the Danish Tax Agency that The Proper Pacific LLC 401K Plan did not have the financial ability to acquire the stocks from which

dividends have been paid and for which a reimbursement of dividend tax has been claimed. Whether this has been done using a substitute for equity or otherwise is legally irrelevant, for the Danish Tax Agency bases its decision on a fundamental misunderstanding of the relevant economic facts by assuming that ownership of stocks must be obtained through capital rather than liquidity obtained by other means.

--------

In accordance with the decision of the National Tax Board in SKM2010.26.SR, it is thus the pension fund that, as the lender of the stocks to third parties, is also entitled to receive the dividends paid by the company on the stocks held by the pension fund.

It is therefore not correct that the pension fund was unable to pay for the transactions in question.

**1.2   Dividends and reimbursed dividend taxes are payable to The Proper Pacific LLC 401K Plan**

Secondly, it is generally disputed that The Proper Pacific LLC 401K Plan (as alleged by the Danish Tax Agency) did not receive the dividends alleged in The Proper Pacific LLC 401K Plan's dividend tax reimbursement requests.

The Danish Tax Agency has not substantiated this view in the contested decision or documented that the pension fund has not received the dividend or the reimbursement.

It should be noted that the dividend tax reimbursement requests were accompanied by so-called Dividend Credit Advices (hereinafter DCA) prepared by the responsible custodian(s). These specifically stated that The Proper Pacific LLC 401K Plan had received the net dividend in respect of the stocks identified in the requests.

According to the Danish Tax Agency's website at the time, the DCAs were sufficient documentation of the receipt of dividends.

It should be emphasized that the DCAs in question were issued by regulated financial institutions authorized to issue such certificates. The Proper Pacific LLC 401K Plan may properly refer to these DCAs as there is no other evidence of receipt of a dividend.

Furthermore, it should be emphasized that, to the extent that the Danish Tax Agency has contested the content of the DCAs - could have obtained relevant documentation from the other professional actors involved in the execution of the transactions at stake (*i.e.*, professional actors responsible for tax-filings, stock-brokerage, clearing, settlement, custody, safe-keeping and administration). However, the Danish Tax Agency failed to do so.

It should be noted in this context that all the professional operators involved have been subject to supervision by public supervisory authorities during the period covered by the case. In addition, the accounts and procedures of the operators concerned have been examined and approved by independent auditors during the period covered by this case.

In particular, in relation to the custodian(s) in question, the Danish Tax Agency has failed to use its authority to obtain relevant information and documentation with

the implementation of the disputed transactions by the competent supervisory authorities. This is particularly relevant in view of the fact that The Proper Pacific LLC 401K Plan held its accounts with a custodian regulated and supervised by the English supervisory authorities. This is of crucial importance as The Proper Pacific LLC 401K Plan – like all other clients of a custodian – obviously does not have access to confidential information of their custodians.

**1.3   Failure to file a tax return in the U.S.**

Thirdly, it is disputed in general that the lack of a tax return for The Proper Pacific LLC 401K Plan under U.S. tax law – as claimed by the Danish Tax Agency – can be given weight in assessing whether The Proper Pacific LLC 401K Plan was the rightful owner of the stocks from which dividends were paid and subsequently claimed back.

Thus, it is disputed that The Proper Pacific LLC 401K Plan's failure to file a Form 5500 tax return in the United States may prejudice The Proper Pacific LLC 401K Plan.

A pension fund is exempt from tax under U.S. tax law if its assets do not exceed the threshold of USD 250,000 on the last day of the accounting year.

It should be noted that the assets of the pension fund may well have exceeded the limit during the year, provided that the assets at the last accounting date were less.

Of course, there may be a variety of specific reasons why the pension fund's assets were less than USD 250,000 at the last reporting date.

For example, the completed stock transactions would typically have been completed at this point (purchase and sale completed), with the effect that the stocks were no longer in custody.

In addition, there are a number of costs associated with the transactions carried out, which also result in a reduction in the pension fund's assets.

It is also possible to make distributions from the pension fund, with the effect that the assets at the reporting date were less than USD 250,000.

In the instant case, The Proper Pacific LLC 401K Plan's assets at each of the respective year-ends did not exceed the $250,000 threshold.

------

It is further disputed that The Proper Pacific LLC 401K Plan's failure to file a Form 990-T self-assessment return in the United States may prejudice The Proper Pacific LLC 401K Plan.

Filing the "Form 990-T" tax return is required if a 401K retirement plan has loan-funded income.

As stated above, The Proper Pacific LLC 401K Plan has not technically borrowed any funds to pay for the purchase of Danish stocks. As noted, The Proper Pacific LLC 401K Plan loaned its stocks to a third party. The cash collateral provided to secure this

lending of stocks, enabled The Proper Pacific LLC 401K Plan to recover the purchase price of the stocks, with the third party (borrower) having to provide collateral (in the form of cash) for the stock loan. The pension fund thus had the necessary liquidity available to pay the purchase price of the stocks.

In this way, the liquidity for the acquisition of the stocks came from the stock lending operation itself. In other words, The Proper Pacific LLC 401K Plan did not have loan-funded income, and therefore The Proper Pacific LLC 401K Plan was not required to file a "Form 990-T" tax return.

-------

Finally, it should be noted that even if the pension fund had erroneously failed to file a tax return in the United States, any failure to file a tax return could in no way result in the pension fund not being the legal owner of the stocks in respect of which the dividend distribution was sought.

In this context, it is noted that the pension fund in the United States is validly constituted and has both formal and effective legal capacity.

**1.4   Registrations in the Central Securities Depository**

<u>Fourthly</u>, it is disputed in general that the failure to register the stocks with VP Securities A/S can be attributed significance in assessing whether The Proper Pacific LLC 401K Plan was the rightful (tax) owner of the stocks from which dividends were paid and for which dividend tax reimbursements were subsequently sought.

It is argued in this regard that it is not possible to determine from the records of VP Securities whether or not The Proper Pacific LLC 401K Plan was the beneficial owner of the stocks.

Thus, this would not be possible in the present case where, as stated, The Proper Pacific LLC 401K Plan has lent the stocks to a third party. In such cases, this third party would appear to VP Securities as a stockholder, notwithstanding that the pension fund remains the legal (tax) owner of the stocks. The same applies in cases where the legal owner has its Danish stocks in an omnibus account or where the custodians themselves use other (sub)custodians.

**1.5   Newly founded pension fund with one participant**

In general, it is noted that the fact whether the pension fund in question is newly established, or has only one member, has no impact on the eligibility of the pension fund to receive dividends.

If the pension fund fulfils the conditions of the double taxation agreement between Denmark and the USA, see Article 22(2)(e), see Article 10(3)(c), the pension fund is entitled under the agreement to a reimbursement of the dividend tax.

The agreement states that Denmark and the USA themselves define what constitutes a pension fund, and that this, cf. also the Danish Tax Agency's decision, is understood as

*"A legal person organized under the laws of a Contracting State for the purpose of providing retirement or similar benefits under a defined benefit plan to employed persons, including self-employed persons, provided that more than 50% of the beneficiaries of such person are natural persons resident in one of the Contracting States."*

Since the pension fund is validly constituted under U.S. law and covered by the Agreement, Denmark must recognize the pension fund as eligible for dividend distribution. It is noted in this context that the Danish Tax Agency has apparently <u>not</u> been informed by the U.S. authorities that the pension fund is not validly constituted etc., as the Danish Tax Agency has not referred to this in the decision.

Furthermore, the OECD's comments on the U.S. double tax treaties indicate that all 401(k) plans with a single component are assumed to be covered by the U.S. treaties, as can also be documented in U.S. congressional documents relating to the vote on ratification of the U.S. double tax treaty.

**2 The Danish Tax Agency's decision must be annulled**

Furthermore, it is submitted in general terms that the Danish Tax Agency's decision of April 06, 2018 must be annulled, so that the previous decisions on the reimbursement of dividend taxes stand, while leaving it to the Danish Tax Agency to carry out the necessary, adequate investigations into the matter.

By decision of April 6, 2018, see Appendix 1, the Danish Tax Agency has revoked previous decisions on the reimbursement of dividend tax.

It should be pointed out in this connection that the Danish Tax Agency's previous decisions on the reimbursement of dividend tax were unquestionably valid, which is also the basis on which the Danish Tax Agency has based its decision, since the revocation of the previous decisions presupposes, in purely administrative law terms, that the decisions were valid.

The initial decisions on the reimbursement of dividend tax were taken on the basis of requests which <u>undisputedly</u> met the current documentation requirements.

It is only now (several years after the submission of the reimbursement applications) that the Danish Tax Agency is questioning the validity of the documentation attached to the applications.

However, the Danish Tax Agency based its subsequent opinion solely on *undocumented assumptions* about The Proper Pacific LLC 401K Plan's lack of ownership and lending of the stocks in question. Thus, the Danish Tax Agency has not provided any actual evidence to support the claim of lack of ownership, etc., and the claim is therefore entirely unsubstantiated.

The Danish Tax Agency has completely failed to obtain relevant information from the many foreign professionals who were undoubtedly involved in the transactions in question. Similarly, the Danish Tax Agency failed to obtain relevant information from foreign supervisory and control authorities.

The failure to obtain relevant information must be viewed in light of the fact that the Danish Tax Agency, through its powers of control, unlike The Proper Pacific LLC 401K Plan, has a real ability to obtain the information requested by the Danish Tax Agency.

The evidentiary doubts regarding the issues raised by the Danish Tax Agency in its decision of April 6, 2018 must therefore be attributed to the Danish Tax Agency's lack of effective investigation, which obviously cannot be detrimental to the Proper Pacific LLC 401K Plan.

As stated, the Danish Tax Agency's revocation is based solely on assumptions made several years after the dividend tax reimbursement decisions. This is, of course, particularly objectionable given the size and very serious significance of the matter for The Proper Pacific LLC 401K Plan. At the same time, The Proper Pacific LLC 401K Plan's ability to rebut the Danish Tax Agency's claims has been significantly impaired by the length of time involved and the fact that SØIK has also seized a large part of the documents in the case.

In light of the above, it is submitted in general that the Danish Tax Agency could and should have conducted a more effective investigation into the matters raised by the Danish Tax Agency and that the Danish Tax Agency's continued failure to do so cannot be detrimental to The Proper Pacific LLC 401K Plan.

The Landsskatteretten must therefore annul the Danish Tax Agency's revocation decision so that the original, valid profit tax reimbursement decisions stand and so that the Danish Tax Agency has the opportunity to conduct a proper investigation of the case."

**The Danish Tax Agency's summary remarks**

In its final observations, the Danish Tax Agency referred to final and summary submissions made in 5 preliminary cases in the complex. These include the following:

"(...)

Despite the submission of several thousand pages of supporting documents, still none of the pension plans can document that they have paid for stocks. Nor can they prove that they have received stocks or that they have received the net proceeds of the stocks they claim to have owned. On the other hand, it is clear that they had no money.

In itself, it is incredible that pension plans with no assets buy such extremely large stakes as alleged – often in the billions. This impression is considerably reinforced when *none* of the pension plans provide their own bank accounts to document cash flows to/from the pension plans' own (bank) accounts, (...) but only some internal records with a custodian without underlying supporting documentation. It is consistent that none of the pension plans provide bank statements, let alone an explanation as to *why* they do not provide their own bank statements.

In more detail, the Danish Tax Agency notes the following:

Table of contents

1.   INTRODUCTION                                                                                           4
2.   THE CASES IN OUTLINE                                                                                   5
     2.1  Fraud complex worth DKK12.7 billion                                                               5
     2.2  The six leading cases                                                                             6

2.3  The alleged arrangement of pension plans                                                    9
2.4  The alleged arrangement could never be applied in reality                                  11
3.    NO MONEY OR CREDIT RATING, BUT BILLIONS IN STOCKS                                          12
3.1  Pension plans had no money and received no net dividends                                   13
3.2  Pension plans have not had access to external funding                                      14
3.2.1  GMSLAs are not credible                                                                  15
3.2.2  The alleged financing was not in place at the time of the contract                       16
3.2.3  The stock loan agreements are "back-to-back "                                            17
3.2.4  GMSLAs have not been respected                                                           18
3.2.5  Stock Lending Rate is arbitrarily fixed and the agreed Rate is not applied (new)         20
4.    UNREALISTIC SET-UP WITHOUT BUSINESS RATIONALE                                             21
4.1  Unrealistically large stockholdings have been traded                                       22
4.2  The profit of the pension plans corresponds exactly to the dividend distribution           24
4.3  There is no commercial rationale behind the alleged transactions (new)                     26
4.4  The zero return on investment is highly unlikely                                           27
4.5  The zero result is achieved by "arithmetic error" alone (new)                              28
5.    ERRORS AND OMISSIONS SHOW THAT NO STOCKSHAVE BEEN TRADED                                   30
5.1  There is no evidence that pension plan custodians ("the Solo Group") have held stocks       30
5.2  Pension plans refer to internal accounting by their custodians ("Custody Statements" – Appendix 10)  32
5.3  Subsequent accounting statements prove nothing                                             33
5.4  Broker Confirmations (Appendix 11) do not document ownership                               34
5.4.1  Brokers do not complete the trade (new)                                                  34
5.4.2  There are several inconsistencies between the alleged stockholdings and the commercial notes (new) 35
5.4.3  Concrete examples of errors in commercial invoices                                       36
5.5  There is no evidence of completed trades                                                   41
5.6  Terms of settlement are not in line with market                                            42
5.7  Trade (and profits)                                                                        44
5.8  It is undocumented that net dividend and reimbursement are eaten up by costs               45
5.9  Custody Agreement has not been respected                                                   45
6.    THE SYSTEM SHOWS THAT IT HAS BEEN A DESK EXERCISE                                          47
6.1  All pension plans buy on the same day and at the same price (new)                          48
6.2  The size of stockholdings is systematized                                                  49
6.3  Pension plans have almost identical equity portfolios (new)                                51
6.4  All pension plans deal with the same parties (new)                                         52
6.5  Time of sale is systematized (new)                                                         53
6.6  Sanjay Shah controlled the custodians of the pension plans (Solo Group)                    55
6.7  Custodian: Sanjay Shah's "universe"                                                        56
6.8  Credit Advices are numbered consecutively across the Solo Group                            57
6.9  Credit Advice from Solo Group was used for attempted fraud in 2017                          60
6.10 Pension plans have maintained that trades were not centrally managed                        61
6.11 Two pension plans forgot to apply for reimbursement (new)                                   62
7.    FORMALIA                                                                                   64
7.1  Burden of proof                                                                            64
7.2  Annulment or revocation – invalid decisions can be revoked                                 66
8.    WHEREAS                                                                                    68
8.1  The money machine of pension plans                                                         68
8.2  One stock may have several owners                                                          68

| | | |
|---|---|---|
| 8.3 | Short-selling results in more stocks on the market than issued by the company | 68 |
| 8.4 | 1 dividend tax may lead to 2 reimbursements | 69 |
| 8.5 | The case is about jura | 69 |
| 8.6 | It is impossible to cheat with stock trader | 70 |
| 8.7 | Changing explanations 1: Pension plans' "conclusive" evidence changes character | 70 |
| 8.8 | Alternate explanations 2: Inconsistencies in explanations of guarantee and payment of reimbursement | 72 |
| 8.9 | Alternate explanations 3: Pension plan accounts | 72 |
| 8.10 | Alternate explanations 4: Lack of evidence | 73 |
| 8.11 | Lack of connection to VP Securities and settlement at netting | 73 |
| 8.12 | Stock borrower will provide security at market value | 74 |
| 8.13 | Speculation as to whether Pinsent Masons has advised Solo Capital | 75 |

## 1.    INTRODUCTION

In addition to the pension plans in the 6 lead cases, TVC Law Firm represents more than 100 U.S. pension plans, all of which have participated in exactly the same arrangement and with the same set of players.

On the basis of alleged ownership of Danish stocks, the pension plans have each been paid many millions of DKK in reimbursements of withheld dividend tax – in the six leading cases from DKK 1.2 million to DKK 70.9 million.

The pension plans cannot prove that they have owned the alleged stocks and that they have received (net) dividends therefrom, (...). And the pension plans' completely identical story is *unrealistic* on a concrete, as well as a general, level.

These are newly established pension plans that had no money or any creditworthiness whatsoever. Yet they claim to have bought Danish stocks worth many hundreds of millions of DKK (and in many cases even billions of DKK). The pension plans claim to have financed the alleged stock purchases by stock lending and forward contracts, but they cannot prove this. In particular, there is no documentation of cash flows and it is therefore not possible to see where the money for the stock purchases would have come from or where it would go, (...).

Anyone who buys stocks will of course secure for themselves evidence of having owned the stocks, but the pension plans apparently have not.

It is completely unrealistic that *one* newly founded pension plan with no money and no creditworthiness could have raised external funding to make such massive investments. And it is even more unrealistic that the same could be done for more than *a hundred* newly established pension plans without money and creditworthiness.

In addition, pension plans cannot document where their alleged massive gains have gone.

The total profit on each stock trade (including stock lending and forward transactions) is *exactly equal* to the reimbursement paid, and the entire profit accrues to the pension plans. This illustrates quite clearly that the arrangement according to the pension plans has the sole purpose of obtaining an unjustified reimbursement from which only the pension plans themselves benefit. The other players in the arrangement (sellers of stocks, buyers of stocks, borrowers of stocks and forward contractors) contribute – according to the history of the pension plans – stocks, money and risk cover, but do not share in the profits. It is therefore an arrangement completely without business rationale for the other actors. Commercial agreements are concluded so that both parties can profit from the agreement. In this case, other players have participated in very significant stock deals without sharing in the profits in thousands of cases.

The pension plans have submitted several thousand pages of supporting material. But none of them has produced its own bank statements. In general, the complex of cases is characterized by a total lack of documentation for money payments and transfers.

The appendix material is both deficient and erroneous, which (although natural when such a voluminous and fictitious arrangement has been constructed) is in itself suspicious when it comes to material that is supposed to document stock transactions worth many billions of DKK.

However, one thing can also be deduced from all the supporting material: there is a completely systematic and centrally coordinated fraud involving reimbursements of withheld dividend tax. The systematic nature of the alleged stock deals clearly shows that they are fictitious deals disguised by pure desk maneuvers.

The history of pension plans is simply not coherent and does not hold in the real world. The pension plans' own explanations are not consistent either, but change according to what best fits their story.

### 2.      THE MAIN FACTS OF THE CASES

The administrative cases concern the question of whether the pension plans were eligible for a reimbursement of withheld dividend tax. The cases do not concern the reimbursement of amounts paid out. The issues of repayment of the amounts are pending in the U.S. litigation filed by the IRS with, *inter alia*, all pension plans represented by the TVC Law Firm, including the six lead cases. The repayment issue will therefore be settled in the civil actions.

### 2.1      Complex fraud cases worth DKK 12.7

The cases concern systematic fraud involving reimbursement of withheld dividend tax from 2012 to 2015, which has resulted in the Danish state being defrauded out of a total of approximately DKK 12.7 billion.

These include 277 U.S. pension plans that have requested – and been paid – remergers of withheld dividend tax. However, the pension plans did not own the stocks in question and therefore did not receive (net) dividends. They were therefore not entitled to the reimbursements in question.

In several cases, the pension plans, etc. have together recovered dividend tax on a scale that is simply impossible.

For example, if all the reimbursement requests were taken into account, they would cover more than half of the stocks (A and B) in A.P. Møller – Maersk A/S. This *cannot possibly* be the case, as known Danish funds themselves own more than half of the total stocks. In addition, there are stocks held by other professional investors.

Another example where reimbursement claims cannot be taken into account, is stockholdings in Tryg A/S. In 2015, Tryg made a dividend distribution and (correctly) withheld approximately DKK 123 million in dividend tax. Subsequently, with reference to ownership of stocks in Tryg A/S, a reimbursement of withheld dividend tax totaling approximately DKK 151 million has been requested. Of this, the pension plans have recovered a total of approximately DKK 136 million. This means that far more reimbursement has been applied for – and paid out – than has been withheld. It goes without saying that there can never be a claim for reimbursement of more than has been withheld. It should be noted that by no means all stockholders are entitled to a reimbursement.

In other words, there has undoubtedly been fraud with the information on the ownership of Danish stocks in the reimbursement applications.

(...)

**2.3      Pension plans' alleged arrangement**

The pension plans have explained their arrangement in their 5 presentations and at the office meetings. All pension plans have used the same model and to a large extent traded the same stocks at the same times.

As an example of the explained arrangement, the smallest of the sample cases – [pension plan A] – can be used. [Pension Plan A] made one alleged stock purchase, namely 2,987,462 stocks in TDC A/S. According to the pension plan, the stocks were acquired on August 07, 2014 for DKK 153,406,173.70.

The transactions can be summarized as follows (...):

(...)

[Pension Plan A] claims (see (...)) that on August 7, 2014 the pension plan purchased approximately 2.9 million stocks in TDC for approximately DKK 153 million. [Pension Plan A] made this purchase without having capital and without having secured financing at the time of the agreement.

On the same day – August 7, 2014 – [Pension Plan A] found a counterparty (a forward counter-party), which was prepared to hedge a stockholding of 2.9 million stocks in TDC at a market value of approximately DKK 153 million. This forward counterparty was thus promised the stock price increases, but in return had to cover any price decreases. The forward counterparty had to be *very* solvent. Price fluctuations of, say, 10 % (some DKK 15.3 million in this case) are not abnormal (...) and this counterparty would thus be able to bear very substantial losses. In this case, the stock price of TDC fell during the term of the agreement and the forward counterparty realized a loss of approximately DKK 16 million (...).

Five days later (on August 12, 2014) [Pension Plan A] lent the 2.9 million stocks. The borrower agreed to provide cash collateral corresponding *precisely* to the stock price on August 07, 2014 (*i.e.* at the time of purchase), even though the stock price – inter alia due to a distribution of DKK 1,5 per stock – had obviously changed since then.

The borrower provided DKK 153 million in cash for the loan of the stocks. The borrower did not require the collateral to be adjusted in relation to the fair value of the stocks, even though the loan agreement (the GMSLA) provided for this by default (...). The collateral amounted to DKK 51.35 per stock, even though the stock price on August 12, 2014 varied between DKK 47.67 and DKK 48.28 (...). Approximately DKK 3 per stock (or DKK 9 million in total) was thus overpriced at the time of the payment of the guarantee.

The next day – August 13, 2014 – [Pension Plan A] had to pay the seller for the stocks in order to get them. And the pension plan had to deliver the stocks to the stock borrower to get the cash collateral. The collateral from the stock borrower matched the purchase price, so the transactions were even and, according to the pension plans, were completed.

On the same day, [Pension Plan A] received the net proceeds of approximately DKK 3.2 million.

On November 05, 2014, [Pension Plan A] disposed of the stockholding for approximately DKK 134 million. The forward agreement was closed at the same price and the stock loan was settled.

On November 12, 2014, (...) on behalf of [Pension Plan A] requested a reimbursement of withheld dividend tax. The request was sent to the Danish Tax Agency, att. Sven Nielsen. Attached to the request was a completed blank application, Power of Attorney, Credit Advice issued by Old Park Lane and Form 6166 from the IRS.

On November 28, 2014, the pension plan received a reimbursement of approximately DKK 1.2 million from the Danish Tax Agency.

### 2.4    The alleged arrangement could never be used in reality

In the Danish Tax Agency's view, the model is not coherent. The alleged arrangement is simply impossible. The pension plans' own explanation of what has happened cannot therefore be accepted.

As can be seen, [Pension Plan A] relied on the agreements to unwind completely. If this did not happen, [Pension Plan A] would be left with risks that the pension plan could not undisputedly bear.

First, [Pension Plan A] had to find a stock seller who would trade stocks for over DKK 150 million with a pension plan without capital and creditworthiness and with no control over funding at the time of the trade (the stocks were, after all, only lent out several days later). In addition, the seller would have to be prepared to forego any price gain arising in the period from the conclusion of the contract to settlement (since such a price rise would accrue to the pension scheme), while retaining the risk of a price fall in the same period if the pension scheme defaulted on the purchase (because the pension scheme had no money).

Secondly, [Pension Plan A] would at the same time have to find a forward counterparty able to bear a very significant loss, since a fall in the exchange rate of, say, 10% would entail a loss of DKK 15.3 million. This forward counterparty had to believe that stock prices would *rise*.

Thirdly, [Pension Plan A] had to find a stock borrower with available cash of DKK 153 million. This stock borrower's purpose for the stock loan necessarily had to being shorting if there was to be a business rationale behind it. In other words, the stock borrower had to believe that stock prices would *fall*.

In addition, the stock seller, forward counterparty and stock borrower had to be prepared for the entire gain – which exactly corresponded to the reimbursement – to go to the pension plan.

Finally, it was necessary for the custodian to ensure that the stock purchase and the stock loan were carried out simultaneously. Otherwise, the pension plan could neither pay for the stocks nor lend them.

It's *quite unlikely* that this whole cabal could unravel for just one pension plan for one stock trade.

However, the pension plans represented by TVC Law Firm claim that not just one, but more than 100 independent pension plans have used this very same approach for countless million and billion-dollar deals. Largely on the same days and with the same stocks.

It is impossible that this could have been possible in the real world. The pension plans' extensive supporting material does not document the alleged stock deals – on the contrary, see §§ 3 and 5, below. When the supporting material is as unreliable as it is, it confirms the fictitious nature of the transactions. The pension plans have thus not proved that they acted in the entirely improbable way they claim.

The reality is that the history of pension plans is purely an accounting record with no real action.

**3.    NO MONEY OR CREDIT RATING, BUT STOCKS WORTH BILLION**

It is undisputed that the pension plans themselves did not have the money to finance the alleged massive purchases of Danish stocks. The stocks could therefore only be purchased through external financing.

Thus, a fundamental necessary (but not sufficient) element in assessing whether pension plans have met their burden of proving ownership of the alleged stocks is whether they were able to obtain external financing for the purchase of the stocks.

According to the TVC Law Firm, the newly founded pension plans had *"easy"* access to financing for their massive million and billion-dollar investments in Danish equities, (…).

In other words, pension plans claim that they could fund their million and billion-dollar investments without having to take a penny out of their pockets and without having to provide any kind of collateral.

That's not true.

It goes without saying that pension plans cannot finance the purchase of the alleged stocks without having either money or creditworthiness.

And if the pension plans have not been able to fund the alleged stock purchases, the pension plans cannot – in the real world – have bought the stocks at all.

**3.1  Pension plans had no money and did not receive net dividends**

The pension plans are "one-participant plans" (Supporting Appendix, § 1.3), and the annual contribution per participant is thus limited, according to the IRS website for 2016, to a maximum of $53,000 ($59,000 for participants older than 55), (…). No evidence has been provided that such contributions have actually been made to the pension plan.

Moreover, the pension plans were *newly founded* when they started their allegedly very massive investments in Danish stocks.

None of the pension plans filed Form 5500 with the IRS, and therefore each may be considered to have assets of $250,000 or less at the end of each *plan year*, as described in the Supporting Appendix, § 1.3.

Nevertheless, pension plans claim to have owned stocks in Danish C20 companies for very large amounts of millions and in some cases even billions of DKK.

The fact that the pension plans have not filed Form 5500 with the IRS, therefore, must be relied upon that they each had assets of no more than $250,000 at the end of their fiscal year which demonstrates not only that the pension plans did not have a sufficient capital base to purchase the massive, alleged holdings, but also that the pension plans did not receive the alleged net dividends.

In the complaints, p. 5, it is stated that

> *"It is also possible to make distributions from the pension fund, with the effect that the assets at the reporting date were less than USD 250,000."*

However, at a meeting on December 13, 2017, the IRS informed the Danish Tax Agency that if a pension plan distributes funds, the pension plan must report the distribution to the IRS on Form 1099-R (…), indicating how much was paid and to whom. The pension plans have not filed this Form 1099-R with the IRS.

Minutes of the Danish Tax Agency's meeting with the IRS on December 13, 2017 are presented as (…).

The pension plans have also not provided any documentation of distributions from the pension plan. The reason for this is the simple fact that the pension plans have not received the alleged net benefits (and subsequently distributed them). It should be stressed that this is the pension plans' own documentation, since the alleged distributions were supposed to have been made by them. However, none of the more than 100 pension plans provides such documentation.

The TVC Law Firm's complaint letter states (…) that there may be a variety of specific reasons why the pension plans' assets exceeded the $250,000 threshold (for purposes of the requirement to file Form 5500 with the IRS) during the year, while the assets as of the last reporting date were less. In *no* case, however, is there any explanation of what specifically caused each pension plan's assets to fall below the threshold. *Possible* reasons include that equity transactions were completed at that time, that transaction costs reduced assets and – as quoted above – that distributions may have been made from the pension plans.

However, no evidence is provided.

It is highly odd that a party sets up some possibility of how he may have acted <u>*without*</u> wanting and being able to tell what he *actually* did. This underscores that pension plans are searching and searching for possible explanations that might save their case.

### 3.2    Pension plans have not had access to external funding

The pension plans claim that they have financed the stock purchases by lending the stocks against collateral (…). The purchase agreement and the loan agreement have been executed (settled) simultaneously (…) and the money from the stock borrower has been used to pay for the stocks.

The explanation does not hold. No one is going to enter into million-dollar transactions – either trades or stock loans – with a party that has no money of its own at all.

The supporting documents submitted do not provide any evidence of financing. There is no cash flow and the contract documents are unreliable. Moreover, even on paper, the agreements have not been respected by the financial plans:

### 3.2.1    The GMSLAs are not credible

The pension plans have presented a number of GMSLAs as (...). In most cases, the pension plans are *not* listed in the GMSLAs as the contracting party and no explanation is given as to how these agreements relate to the individual pension plans.

The counterparties to the GMSLAs are in all cases companies domiciled in notorious tax havens and at the same addresses in the Cayman Islands and the British Virgin Islands respectively.

The GMSLAs presented are in many cases not signed by (all) contracting parties and no agreement has been reached on *e.g.,* currency.

Furthermore, the GMSLAs are undated, which supports that they are merely constructed for the occasion.

In other words, the GMSLAs in no way demonstrate that the pension plans thereby had the opportunity to raise sufficient liquidity to fund the alleged equity investments, nor is this alleged raising of liquidity evidenced by account statements.

In a letter dated October 26, 2017, the IRS also informed the Danish Tax Agency about the possibilities for pension funds to finance stock purchases with borrowed funds (...):

> *"[...] given the size or magnitude of the purported funds borrowed from a third party or GMSLA, these arrangements are <u>highly suspect</u>. A typical first-year, one-participant pension plan or one-participant plan in existence for two or even three years <u>would likely not have access to the millions of dollars required </u>to collateralize the GMSLA used in these transactions."* (emphasis mine).

In other words, it is not true when pension plans claim that, despite their modest equity, they had the ability to fund the alleged massive equity investments.

According to the pension plans, the GMSLAs enabled the financing of stock purchases by simultaneous stock lending to third parties against cash collateral. The delivery of stocks to the pension plans took place at the same time as the payment from the pension plans ('Delivery Versus Payment'), (...). This is simply not a practical option for the simple reason that the pension plans undeniably had no money. And no one is doing either GMSLAs or OTC trades with a party that either has money or creditworthiness. That goes without saying.

For the same reason, a contracting party would not allow the pension plans to pay for the stocks until after the purchase date, because there is no certainty that the pension plans would be able to fulfill such agreements.

### 3.2.2    The alleged financing was not in place at the time of the agreement

With regard to the stock loans, the pension plans state in (...) that the stock borrowers undertook, by means of specific agreements, *"to provide security in the form of cash equivalent to the market price of the stocks on the date on which the pension plans concluded the agreement to purchase the stocks."*

So, the pension plans' explanation is that the stock lending agreements were always concluded at the same rate as the alleged stock purchases.

This is a completely unlikely approach. If the stock price *falls* in the period between the purported stock purchase and the establishment of the stock loan, the stock borrower will obviously only provide security in line with the reduced market value at the time of the stock loan. In this way, the pension plans will not obtain the contingent security necessary to pay for the stocks. Conversely, if the stock price *rises*, the pension plans will naturally require collateral in line with this price increase. This follows from the "Marking-to-Market" provision in Paragraph 5.4 of the GMSLA (...).

In (...), the pension plans state:

> *"Moreover, the stock loans were not established until after the dividend date."*

In (...) this is elaborated:

> *"The stocks were paid two and three days after purchase by lending the stocks the day after the dividend date and thereby receiving a cash collateral equal to the purchase price of the stocks. The individual stock loans were settled under the GMSLA framework agreement concluded prior to the stock deal."*

(...)

Moreover, it does not make sense that pension plans (without equity) should have entered into multi-million (and in some cases billion) dollar stock purchase agreements, only to try to raise funding through stock lending several days later. It is quite unlikely that the stock seller would allow the pension plans to pay only after the conclusion of the purchase agreement ("Delivery Versus Payment," (...)), when at the time of the purchase the pension plans did not even have the financing in place. It is even more unlikely that the custodian would agree to such *ex post* funding.

### 3.2.3    The stock loan agreements are "concluded backwards"

The pension plans claim that they have financed stock purchases through stock lending. In support of this, the pension plans have provided, *inter alia*, e-mails which, according to the pension plans, show how the stock loan agreements were concluded.

The pension plans have only provided examples of these email correspondences, (...). In (...), the pension plans were requested to provide *"all correspondence concerning stock loans."* The request has not been answered.

(...)

### 3.2.4    The GMSLAs have not been complied with

The stock loan agreements (GMSLAs) contain a condition that the collateral may be adjusted *daily* at the market rate (...). The clause is called "Marking-to-Market."

Such a possibility of daily regulation of the collateral safeguards both the stock borrower and the stock lender against excessive risks. As long as the collateral corresponds to the market value of the stocks, both the borrower and the lender have full security. If the borrower does not return the stocks, the lender has money to make replacement purchases. If the lender does not repay the collateral, the borrower can sell the stocks and obtain satisfaction from the proceeds. When the stock price changes, this balance disappears. For example, if the stock price rises by 10%, the lender no

longer has full security for the return of the stocks. Conversely, the borrower does not have full security for the repayment of the collateral (*i.e.,* the money) if the stock price falls.

The 'Marking-to-Market' clause is thus central to maintaining the balance between the parties and to minimizing the risks to the parties. The clause allows for a continuous adjustment of the collateral, so that both parties have (almost) full collateral at all times. Independent parties will of course enforce such a term on an ongoing basis in order not to be left with an unsecured claim.

An example of the importance of the term is [Pension Plan A's] purchase of TDC stocks (...). According to the pension plans, the stocks were purchased at a price of 51.35 on August 07, 2014 (including a dividend of DKK 1.5 per stock). Immediately afterwards, the TDC stock price fell very sharply (...). On August 12, 2014, the price was between DKK 47.67 and DKK 48.28. On November 03, 2014, the price was between DKK 44.95 and DKK 45.41 (...).

The stock borrower had provided cash collateral of DKK 153,406,173.70 on August 12, 2014. Already at that time, the market value of the stocks (at the highest price of the day, DKK 48.28) was only DKK 144,234,665.36. The stock borrower thus had an unsecured claim of more than DKK 9 million, which the pension plan undoubtedly did not have the means to cover.

When the stock loan was settled on November 05, 2014, the price was DKK 45 per stock and the market value was thus DKK 134,435,790 (...). The unsecured receivable at that time was DKK 18,970,383.70.

As the example shows, the stock borrower had a *very significant* unsecured claim as a result of the stock price movement. The "Marking-to-Market" clause in the GMSLA was intended to avert such risks by providing for a continuous adjustment of the collateral. It would have been *obvious* in a case such as this – in accordance with the GMSLA invoked – to adjust the collateral downwards, so that the stock borrower would not have had an unsecured claim.

However, this did not happen. Indeed, as shown by (...), no payments were booked under the Marking-to-Market clause at any time prior to November 05, 2014, when the entire mortgage agreement was settled.

This means that the stock borrower apparently accepted to have an unsecured receivable of many millions of DKK from August 12, 2014 to November 5, 2014. This was despite the fact that the receivable was with a pension plan that undisputedly had no funds.

If a daily regulation (Marking-to-Market, (...)) was not made in any case, it must be because it was not necessary – because there were no stocks and therefore no risks.

the TVC Law Firm states in (...) that Paragraph 5.4 of the GMSLA does not apply;

> *"Had the Danish Tax Agency read Appendix 1.3 to the GMSLA, it would have seen that such daily regulation was not required, as it is not Paragraph 5.4 but rather Paragraph 5.5 that applies."*

TVC Law Firm's statement is quite incomprehensible and must be due to a misreading of the GMSLAs. The statement is certainly wrong. The reference to *"Appendix 1.3 to the GMSLA"* is presumably a reference to the "Schedule" of the GMSLAs, Paragraph 1.3.

In the "Schedule" to the GMSLAs the following is stated in point 1.3, (...):

| 1.3 | Basis of Margin Maintenance: | |
|---|---|---|
| | Paragraph 5.4 (aggregation) shall not apply* | ☐ |
| | Paragraph 5.4 (aggregation) applies unless the box is ticked. | |

As can be seen, point 5.4 applies unless the box is checked off – which it is not. The provision in point 5.4 on the daily adjustment of the security therefore applied.

### 3.2.5    *Stock Lending Rate is arbitrarily set and the agreed Rate is not applied (new)*

The pension plans cannot explain what factors are relevant for the calculation of the stock lending fee stated in the custody statement (...), which was allegedly paid in connection with the stock lending.

In the pension plans' (...), the pension plans state that the relationship between the 'capital strength' of the stock borrower and the lender (*i.e.,* the pension plan) is important when negotiating the interest rate and the stock loan amount.

This is not true if the pension plans otherwise mean by their statements that the fee is set by negotiation.

A review of the custody statement provided (...) shows that the determination of the Stock Lending Rate does not depend on who is the contracting party.

As (...) an example is presented of a list of pension plans represented by TVC Advokatfirma, which in 2015 lends A.P. Møller Maerk A/S A-stocks, (...). The overview has been prepared using data from the custody statements provided by the pension plans (...). The table shows that the Stock Lending Rate is the same for the pension plans that lend the stock for the same number of days, regardless of who the pension plan lends the stock to.

The same result is seen for <u>all</u> transactions for <u>all</u> pension plans lending the same stock in the same period.

It is highly unlikely and appears contrived that all pension plans enter into exactly the same agreement with different contracting parties.

This shows that the Stock Lending Rate is *not* determined by the capital strength of the parties and by a negotiation of the interest rate. Rather, the Stock Lending Rate is set to make the transactions go to zero, see § 4.5.

In addition, there is a discrepancy in the [Pension Plan B] lending of 998,992 Coloplast stocks in 2014. [Pension Plan B] agreed in email correspondence with the contracting party (...) a stock loan fee of 36.47 base points, *i.e.,* 0.3647% (...). According to the custody statement (...), the stock lending rate was 0.0173% at the time.

It does not make sense to use a Stock Lending Rate other than the one agreed between the parties. This illustrates that the parties' paper agreements are made for show only. If there had been

real stocks and money involved, the parties would of course have reacted to the fact that the cost of the loan differed from what had been agreed.

## 4.    UNREALISTIC ARRANGEMENT WITHOUT BUSINESS RATIONALE

It is unrealistic that the alleged arrangement of pension plans could take place in the real world. In this section, the Danish Tax Agency ignores the characteristic total lack of documentation that characterizes all pension plan cases.

As described in § 2.4, above, there are *far* too many parties involved in transactions that need to be bottled in one particular way. It is *deeply* unrealistic that this would happen even once if real stocks and money were involved between independent parties. However, pension plans make the case that it has all bottled up in every single stock trade for more than 100 pension plans. However, this can only happen if there is no money or stocks and if the parties are not independent.

In addition, the pension plans have each traded equity securities of a size that is quite extraordinary (§ 4.1, below). Even leaving aside the lack of funding, it is doubtful that a single pension plan would be able to acquire such a large stockholding in a single day, given that the volume of each trade is highly unusual in the Danish stock market. It is obvious that *so many* pension plans have not been able to buy *such large amounts* of stocks in one day. This shows that the stocks are fictitious.

In addition, in *each* case, the pension plans allegedly had an arbitrage gain exactly equal to the dividend distribution (excluding broker fees, etc.), see § 4.2, below. It is very remarkable that the figures match in this way – and this happens in the case of *all* pension plans for *all* trades. This means that *all the* transactions result in 0 if the dividend reimbursement is excluded. This would not be the case if there were real trades between independent parties (§ 4.4, below).

Indeed, a deeper analysis shows that the zero result is achieved only because a certain expense (Stock Lending Fee) is adjusted to exactly the value that makes it all go to zero (§ 4.5, below).

Finally, it must be concluded that, in any event, it is inconceivable that the alleged co-contractors would participate in the arrangement described by the pension plans, since the pension plan receives the entire arbitrage profit without sharing with the other parties (§ 4.4).

A systematic review of the pension plans' alleged arrangement and "documentation" thus shows that it is deeply unrealistic that stock trading would have taken place in the way claimed by the pension plans and otherwise shown in the supporting documents.

## 4.1   Unrealistically large stockholdings have been traded

[Pension Plan C] allegedly acquired 6,267,033 B-stocks in Novo Nordisk A/S on March 19, 2015. The stocks were purchased from the broker (...) for a total of DKK 2,142,698,582.7, equivalent to DKK 341.90 per stock.

[Pension Plan C] was established in September 2014, and the pension plan has not disclosed, through Form 5500, assets with an aggregate value of more than $250,000 to the U.S. tax authorities (...). It is deeply unrealistic that such a pension plan with no assets of any significant value would purchase stocks worth more than DKK 2.1 billion in a Danish listed company.

Moreover, it is unrealistic to think that it would be possible to acquire such a large stake in one day. It is very rare that such a large stake is put up for sale in one go. When the estate of Maersk Mc- Kinney Møller had to sell stocks worth up to DKK 3.9 billion, it did so through accelerated book building – not on the free market (...).

Nevertheless, the broker of the pension plan in question, (...), was able to obtain the stock with a market value of approximately DKK 2.1 billion.

[Pension Plan C] is far from the only pension plan claiming to have acquired Novo Nordisk stocks for approximately DKK 2 billion on March 19, 2015.

Of the more than 100 pension plans represented by the TVC Law Firm – and which have submitted custody statements (...) – 76 pension plans have, according to their custody statements (...), purchased stocks in Novo Nordisk A/S on March 19, 2015. The pension plans have *each* purchased between 5.7 million stocks and 7.1 million stocks (equivalent to Novo Nordisk stocks worth approximately DKK 2 billion for each pension plan).

Together, these 76 pension plans acquired 482 million stocks in Novo Nordisk *on the same day*. There were a total of 2.113 million B-shares in the company, and the pension plans represented by the TVC Law Firm have thus acquired more than 22% of Novo Nordisk stocks *in one day*.

It simply doesn't make sense.

On the one hand, pension plans have not been able to afford it. And secondly, it would simply not be practical to find *sellers of* so many stocks in one day.

All the stocks were acquired at the *same* price, namely DKK 341.9 per stock, which was the market closing price on the date in question, when the price had varied between DKK 335 and DKK 342 (...). The next day the stock opened at DKK 341.7.

It is striking in itself that all the pension plans acquired Novo Nordisk stocks at *exactly the same price*. Moreover, it goes without saying that it is not possible to buy so many stocks in the market in one day without affecting the price dramatically. Such a massive demand would of course lead to a significant price increase. The fact that the market price has been unaffected by such massive trading in one day is of course due to the fact that the trading has not *actually* taken place.

The Novo Nordisk stock in 2015 is not the only place where, according to the reimbursement requests to the Danish Tax Agency, very significant acquisitions should have taken place. The Tax Agency has carried out an analysis of all the reimbursement requests covered by the complex of cases (see Supporting Appendix, § 5). The analysis shows that the unknown pension plans, companies, etc. together – according to their reimbursement requests – would have owned some quite unrealistically large stocks of Danish-listed companies around the dividend date (...).

For example, the following pension plan ownership interests are highlighted:

**At the time of distribution in 2014**
| | |
|---|---|
| A.P. Møller | 51.4% |
| Novo Nordisk | 59.5% |
| TDC (August distribution) | 78.4% |

**At the time of distribution in 2015**
| | |
|---|---|
| Carlsberg | 58.5% |
| Danske Bank | 65.3% |

| | | |
|---|---|---|
| Novo Nordisk | 61.7% | |
| TDC (March distribution) | 79.7% | |

This means that, for example, 65.3% of the stocks in Danske Bank should have been owned by unknown foreign pension plans etc. around the dividend date in 2015. This is of course not true.

**4.2    Pension plan profits exactly equal dividend payout**

It appears from (…), as an example, that the total arbitrage gain of the seller and the buyer (which corresponds to the reimbursement) is distributed with 87.5% to the seller and 12.5% to the buyer (the pension plans). The example is not consistent with the supporting documents provided by the pension plans.

As an example, [Pension Plan D's] purchase of Danske Bank stocks (…) is representative. The following transactions involving the purchase/sale of stocks, loans and forwards are shown:

| Mar 18, 2015 | Equity | Buy 3.519.967 Danske Bank A/S @ 175,3 DKK | -617.050.215,10 |
|---|---|---|---|
| Mar 18, 2015 | Forward | Sell 3.519.967 Danske Bank A/S @ 171,2147 DKK EXPIRES 19.Jun 15 | |
| Mar 19, 2015 | Dividend | CASH DIVIDEND Danske Bank A/S  PD 23.Mär 15 | 14.132.667,50 |
| Mar 20, 2015 | Stock Loan | Lend 3.519.967 Danske Bank A/S @ 175,3 DKK | 617.050.215,10 |
| ;May 22, 2015 | Dividend | Tax Reclaim Danske Bank A/S | 5.227.151,00 |
| June 2, 2015 | Equity | Sell 3.519.967 Danske Bank A/S  @ 198 DKK | 696.953.466,00 |
| June 2, 2015 | Forward | Buy 3.519.967 Danske Bank A/S @ 197,9673 DKK EXPIRES 19.Jun 15 | -94.168.269,17 |
| June 2, 2015 | Stock Loan | Recall 3.519.967 Danske Bank A/S @ 198 DKK | -696.953.466,00 |
| June 2, 2015 | Stock Loan | Stockloan MTM Realized | 79.903.250,90 |
| June 2, 2015 | Stock Loan | Stocklending Fee | 132.350,77 |

When these "cash flows" are added together, the result of the stock purchase, stock sale, stock loan and forward agreement, as well as the net dividend and reimbursement for the pension plan, is obtained. The result of these transactions is a profit for [Pension Plan D] of DKK 5,227,151.00.

This corresponds exactly to the reimbursement ("Tax Reclaim Danske Bank A/S" in the 5th line of the table, above).

The profit of the pension plan is therefore equal to the dividend distribution. However, some minor fees are paid to brokers (…), tax reclaim agent (…) and for the use of the platform (…).

This means that if the reimbursement is not taken into account, all the transactions will be zero. And the same 0 result

(before reimbursement) is found for each of the 6 drivers (…)

(…)

And from custody statements (…) the same result can be seen for all transactions for all pension plans.

In all cases, it is the pension plan that receives the entire arbitrage gain – which corresponds exactly to the dividend distribution. This fact in itself also proves that the pension plans have claimed the right to dividend distribution on a fictitious basis.

**4.3    There is no business rationale for the alleged transactions (new)**

The pension plans claim that they have all used the investment strategy 'dividend arbitrage' (...):

> *"By buying the stock, receiving the net dividend and a reimbursement of withheld dividend tax, and selling the stock again at a lower price (the stock price falls after the dividend is paid), the pension plan could realize a gain. It was this gain that was the purpose of the entire transaction."* (...)

> "*Exchange arbitrage is a low-risk investment strategy caused by the fact that, due to different double taxation conventions, an exchange does not have the same value for every investor. Investors without a double tax treaty will seek to sell their stocks to the market before the dividend date, while investors with favorable terms in the double tax treaties will seek to buy stocks before the dividend date. The different buying and selling preferences immediately lead to price differences in the different markets (spot and futures) for the same stock. It is this difference that the dividend arbitrager uses to realize a gain.* " (...)

Thus, pension plans argue that there is a gain to be made from trading stocks around the dividend date because the stock dividend does not have the same value for all investors, with some investors having to pay dividend tax while others do not. The alleged arbitrage gain (which is achieved by trading in different markets and a complex arrangement of transactions between *many* parties) is thus at most the dividend tax that can be saved.

The total gain for *all* participants in dividend arbitrage cannot therefore be more than the dividend merger (the tax saved).

In general, the Danish Tax Agency disputes that dividend arbitrage is a recognized investment strategy that can function as a pure money machine. There is no evidence that the stock and spot markets behave as the TVC Law Firm claims.

Even *if* dividend arbitrage were a possible investment strategy, pension plan documentation is inconsistent.

The alleged investment strategy requires the involvement of a wide range of parties:

| Part | Performance |
|---|---|
| Seller | Delivers the stocks |
| Pension plan | ? |
| Buyer | Acquires the stocks. |
| Stock borrower | Provides financing. |
| Forward buyer/seller | Hedges price risks. |
| Custodian | Responsible for solvency and execution of transactions. |

As can be seen, each party, with the exception of the pension plan, is reported to be contributing what is necessary for the transactions to be carried out with the desired result. It goes without saying that all parties must receive a stock of the profits before it makes sense for them to enter into the arbitrage transaction. Otherwise, there is no business rationale for them to participate in this arrangement, which obviously entails a number of risks, such as default by counterparties and insolvency of counterparties.

As shown in § 4.2, above, the arbitrage transaction gives the pension plan a positive result <u>equal to the</u> dividend distribution. This is the total maximum gain for the dividend arbitrage arrangement. And it is earned by the pension plan *alone*.

The pension plan thus does not stock the arbitrage gain with anyone. This means that *no* other parties gain from participating in this arrangement – apart from the small fees they receive for executing transactions.

None of the other parties thus has any commercial incentive to engage in arbitrage. This applies to <u>all</u> the transactions which the pension plans represented by the TVC Law Firm claim to have concluded and for which they have provided 'evidence'.

The other parties would therefore not have participated in this arrangement if they were real traders. For this reason, too, it is completely unrealistic that the trades should have taken place.

**4.4   The zero return on investment is deeply unlikely**

As noted in § 4.2, above, it is striking that pension plan profits are quite equal to the dividend payout when taking into account

- Purchase and sale of stocks
- Forward agreements
- Stock Lending Fee and Interest Rebate
- Net dividend

All these transactions together add up to exactly DKK 0 for <u>all</u> alleged stock trades for <u>all</u> pension plans that have provided documentation.

Such a result cannot be achieved in reality, but only as accounting entries coordinated centrally.

Indeed, it is highly unlikely that the fee in the stock loan agreement should correspond precisely to the loss/profit of the forward contract added to the price fluctuations of the purchase/sale in just one single case. And therefore, it is of course impossible that this should consistently be the case.

**4.5   The zero result is reached only by "calculation errors" (new)**

A component of the zero result is the loan cost, which is allegedly settled with the counterparty to the stock loan. The borrowing costs consist of the Interest Rebate and the Stock Lending Fee.

The Stock Lending Fee *should* be calculated based on an agreed Stock Lending Rate, the amount borrowed and the length of the loan period, *i.e.,* according to the following formula:

$$\textbf{\textit{Stock Lending Fee}} = \textbf{\textit{Stock Lending Rate}} * Amount * \frac{interest\ days}{360\ interest\text{-}bearing\ days}$$

However, there are *no* cases where the Stock Lending Fee is set in this way. Instead, the Stock Lending Fee is set at exactly the amount needed to bring the total to 0. In other words, the Stock Lending Fee is calculated as a variable that makes the equation equal to 0.

An example is [Pension Plan B's] lending of 998,992 Coloplast stocks in 2014. The custody statement ...):

| Settlement Date | Return Date | Type | Underlying | Nominal | Start Price | Start Cash | End Price | End Cash |
|---|---|---|---|---|---|---|---|---|
| 09 December 2014 | 19 December 2014 | Lend | COLOB DC | 998,992 | 527,0000 | 526,468,784.00 | 501.5000 | -500,994,488.00 |

| Trade Date | Nominal | Cash | Return Date | No. of Days | Rate | Stock Lending Fee | Rate | Interest Rebate |
|---|---|---|---|---|---|---|---|---|
| 08 December 2014 | 998,992 | 526,468,784.00 | 19 December 2014 | 10 | -0.0173 | 2,525.23 | 0.7000 | -102,368.93 |

Here, allegedly DKK 526,468,784 is lent for 10 days at an agreed Stock Lending Rate of 0.0173%. Thus Stock Lending Fee *should* be:

$$Stock\ Lending\ Fee = Stock\ Lending\ Rate * Amount * \frac{interest\ days}{360} = 0,0173\ \% * 526.468.784 * \frac{10}{360} = 2.529,97\ kr.$$

However, as can be seen from the custody statement above, the Stock Lending Fee has been set at DKK 2,525.23.

This is a deviation of DKK 4.74, which seems insignificant in transactions involving hundreds of millions of kroner. However, the deviation is of great importance for the overall picture.

Indeed, the deviation can be found in <u>all</u> pension plans' stock trades. In <u>all</u> cases, there is a "calculation error," which means that the transactions (purchase, sale, forward, loan, loan costs and net dividend) add up to DKK 0.

The "error" supports the fact that there is *no* question of independent parties having concluded stock transactions and stock loan agreements. Rather, *someone* calculated how the transactions should be constructed so that the total result would be 0.

This is further supported by the fact that the Stock Lending Rate appears to have been agreed at a different rate to that set out in the custody statement (§ 3.2.5, above)

By "calculating backwards" it is possible to calculate the Stock Lending Rate from the Stock Lending Fee, the loan amount and the number of interest days. For [Pension Plan B's] lending of Coloplast stocks (the example above), this gives the following "actual" Stock Lending Rate:

$$Stock\ Lending\ Rate = \frac{Stock\ Lending\ Fee}{Amount * \frac{interest\ days}{360}} = \frac{2.525,23}{526.468.784 * \frac{10}{360}} = 0,01726755370172150\ \%$$

The Stock Lending Fee thus corresponds to a Stock Lending Rate that is *almost* equal to the Rate indicated in the Custody Statement (0.0173%). In fact, the Rate in the Custody Statement is (probably) just a rounding of the Stock Lending Rate that has been applied.

However, this makes *no* commercial sense. After all, the pension plans and their counterparties, the stock borrowers, have <u>agreed on</u> a Stock Lending Rate – and of course it is not agreed to 15 decimal places. It is from that rate that the Stock Lending Fee should be set. It is not the other way around.

This means that the custody statement (...) has been cheated on the scales in order to make the transactions go to zero. The Stock Lending Fee amount has just been set to the amount

that must be used for the calculation to dividend 0. This is subsequently camouflaged by setting the Stock Lending Rate to something *close to* the correct result.

**5.    ERRORS AND OMISSIONS SHOW THAT NO STOCKS HAVE BEEN TRADED**

**5.1  There is no evidence that the pension plan custodians ("Solo Group") held stocks**

All pension plans represented by TVC Law Firm, except one, have used one or more of the following 4 custodians: Old Park Lane, Solo Capital, Telesto and West Point.

(...)

The four custodians – Old Park Lane, Solo Capital, Telesto and West Point – are collectively referred to as the "Solo Group." The four companies have been controlled by Sanjay Shah (§ 6.6, below), who is alleged to be one of the main backers of the proceeds case.

The Solo group is only known to the Danish Tax Agency from this complex of cases.

As custodians, Solo Capital, Old Park Lane, Telesto and West Point have certified ownership of Danish stocks and that dividend tax has been withheld on distribution. This has been done by issuing Credit Advices which, according to the pension plans, certify the ownership of a given stock, the receipt of dividends for that stock and that dividend tax has been withheld. On the basis of the Credit Advices in question (which the pension plans submitted with the reimbursement requests), the Danish Tax Agency paid reimbursements of withheld dividend tax to the pension plans' agents.

Credit Advices prepared by the Solo Group have led to the reimbursement of approximately DKK 9 billion out of the total of approximately DKK 12.7 billion involved in the fraud:

| Custodian | Reimbursement |
|---|---|
| Solo Capital Partners LLP | 5,442,113,750 |
| Old Park Lane Capital PLC | 1,776,763,390 |
| Telesto Markets LLP | DKK925.443.359 |
| West Point Derivatives Ltd | DKK880,884,044 |
| *Grand total* | *9,025,204,543* |

The Solo-group must therefore have held stocks to an extraordinarily large (and unrealistic) extent on behalf of pension plans if the clients/pension plans were to have been entitled to reimbursement to this extent. According to the Credit Advices issued, the Solo Group received and settled a total of DKK 24.4 billion in net dividends to its customers.

However, there is *no* evidence that the Solo Group held the stocks that the pension plan claims to have owned and for which the Solo Group has certified ownership:

- None of the custodians in question (or the pension plans themselves) are registered with VP Securities, and it is not otherwise documented that the Solo Group actually has

held equity positions for the pension plans, for example by showing a chain of sub-custodians where there is a link to a securities account in VP Securities.

- No evidence has been provided that the Solo Group has received net dividends for stockholdings on behalf of its clients (the pension plans). The net dividend should otherwise amount to DKK 24.4 billion.

- For a number of pension plans that have used the Solo group as custodians, the Public Prosecutor for Special Economic and International Crime ("Statsadvokaten for Saerlig Økonomisk og International Kriminalitet," SØIK) has in a letter dated November 23, 2017, the Danish Tax Agency was informed that SØIK could not confirm, on the basis of the investigation conducted at that time, that 66 specific pension plans had received stock dividends as a result of holding Danish stocks. Nor could SØIK confirm that the pension plans had held Danish stocks, including by contacting VP Securities A/S (...). The statement has been confirmed on July 12, 2019 (...).

- No evidence has been provided of cash flows to/from the Solo Group as a result of the significant investments in Danish equities.

There is thus no money or stock trail that in any way documents, let alone makes probable, that the Solo group would have held a single stock in Danish companies on behalf of the pension plans.

Yet the Solo group has issued documents (including Credit Advices) that have led to the reimbursement of over DKK 9 billion from the Danish state on the basis of alleged stockholdings.

The "universe" of the Solo Group is fictitious and constructed by Sanjay Shah, and documents issued by the Solo Group are therefore of no evidentiary value.

### 5.2    The pension plans refer to the internal accounting of their custodians (...)

The pension plans have provided as (...) a custody statement prepared by their respective custodians. However, [Pension Plan C] has only provided a custody statement for one of several Shah-controlled custodians used, which is also characteristic of a number of other pension plans.

(...)

In any case, the custody statements in question (...) cannot prove ownership of stocks, as the supporting documents do not show movements and balances relating to the pension plans' stockholdings and cash (*i.e.,* the assets that the custodian should hold in custody).

Thus, <u>firstly,</u> the custody statements provided (...) do not show statements of *cash balances* of the pension plans showing movements and daily balances, including deposits and withdrawals of funds, outgoing and incoming amounts relating to the purchase and sale of stocks, receipt of income (*e.g.,* dividends, reimbursements and interest) and payment of fees to *e.g.,* brokers.

<u>Secondly</u>, the custody statements provided do not contain the account statements for the pension plans' *stockholdings*, which show for each stock the name of the stock issuer, the number of stocks, the increase and decrease in the number of stocks (as a result of the purchase and sale of stocks) and the current value of the stocks in question (as well as a breakdown of the price gain or loss).

As the custody statements provided lack this key information, it is misleading to refer to them as "custody statements."

Thus, the custody statements submitted (...) – or, for that matter – do not provide any account statements that document that money has actually been deposited in and withdrawn from the pension plan account, let alone that stocks have actually been received in the pension plan's stock account.

In general, there is no evidence of any transfer of stocks to (and money from) the pension plan account.

If money and stocks do not change hands – which will be shown on the account statement – it is not a stock trade, but at most a fraud *disguised* as a stock trade.

If money and stocks don't change hands, there will be no point in having a custodian either (other than to disguise the fraud).

The only "proof" in this custody statement that there should be stocks and payments is that the Shah-controlled custodian in question "declares" that the stock is there and "posts" stocks/payments (internally). Just as Credit Advices from these Shah-controlled custodians are not indicative of any reality, see Paragraphs 6.8-6.9, below, neither, of course, is their internal bookkeeping.

**5.3        Subsequently prepared summary accounting records prove nothing**

The pension plans have provided "summary accounting records" (...). The (...) states that "*The individual entries in the pension scheme's account with its custodian are shown in the statement, which is presented as (...)."* Such a statement has been provided for each of the (...) cases.

(...)

The accounting statements provided (...) are not statements of account but merely extracts from undated Excel sheets which have no authoritative character. In (...) the Danish Tax Agency pointed out a number of errors in these statements:

- Transactions are recorded on the trade date and not on the delivery date.
- The tables do not include all entries for a given period.
- Entries that do not appear in the custody statement are nevertheless shown in the table. These include broker and custodian fees and dividend payments.
- "*Stocklending Fee*" appears in the table, but corresponds to "*Total Fees and Rebates*"

The tables can therefore not be used.

The pension plans subsequently stated that the summaries were merely "*a summary of events prepared by [the pension plans' representative] on the basis of the trading records available to the pension plans."* (...). It is not clear what "records" are involved. The pension plans further state that "*the discrepancies found arose from the simplifications made to the statements drawn up by Schaffelhuber Müller & Kollegen S.à.r.l. in order to explain the transactions in a simple manner to the Danish Tax Appeals Agency."* (...).

Such summaries drawn up subsequently for the purposes of the appeal have no evidential value.

Moreover, it is striking that the pension plans' representative in (...) has been able to provide information such as the payment of dividends to the pension plan and fees when such information *does not* appear in the custody statement (...), but allegedly in a cash account which the pension plans do not possess (...).

### 5.4    Broker Confirmations (...) do not document ownership

#### 5.4.1   *Brokers do not complete the deal (news)*

In all cases, the pension plans allegedly used an executing broker. The pension plan claims (...) that a purchase order has been placed with the custodian/clearing agent, which is part of the Solo group. No evidence of these purchase orders has been provided. Once the custodian has approved the order, the order has been placed with an executing broker.

The executing broker was allegedly responsible for matching the order – *i.e.,* finding a buyer/seller for the given stock. After matching, the broker has issued a broker confirmation (...) setting out the terms of the trade.

Subsequently, the custodian of the pension plan allegedly arranged for the clearing of the transaction (...). That is to say, it is a custodian of the Solo group who has been responsible for and has checked whether the trade was *in fact* carried out by an exchange of stocks and money.

Thus, the trading records provided do not document that the pension plans actually purchased stocks. A trading note is merely a confirmation of an agreement to trade stocks, stating the key terms of the deal. A trading note does not prove that the stock trade has actually been executed, if only because the broker does not know whether the trade has been executed in accordance with what was agreed.

For this reason alone, the brokers' material cannot prove that the pension plans held stocks.

The pension plans attach considerable weight to the broker confirmations in (...). It is argued in (...) that the trade confirmations *"are the decisive evidence that a stock purchase has taken place'* and that the trade confirmations are *'the decisive evidence against the allegations of fraud,"* (...).

This is wrong, as the trade notes do not document the execution of the trade (exchange of money and stocks). In the complex, the use of brokers and the presentation of trade notes only serve to hide the fact that no stock transaction has actually taken place.

#### 5.4.2   *There are several discrepancies between the alleged stockholdings and the trading notes (new)*

*If* the pension plans had actually traded stocks, the process should be as follows when using an executing broker:

1. The pension plan places an order (*e.g.,* for purchase) – possibly after approval from the custodian
2. The broker matches the pension plan with a counterparty (*e.g.,* a vendor)
3. The broker makes a trade note (broker confirmation)

4. The transaction (settlement) is carried out in accordance with the agreement

If everything had been done properly, the trade should be settled on the terms set out in the trade note (unless there is a mistake in settlement). In other words, the trade note (for real stock trades) should determine the terms of the trade.

However, *in these cases,* the pension plans have submitted a large number of commercial notes in which the contractual terms do not correspond to the order allegedly given by the pension plans according to the custody statement (...). These are very serious errors (see § 5.4.3).

*Nevertheless, the* transaction has been carried out in accordance with the pension plan's alleged – and undocumented – purchase order. This is the equivalent of booking a train ticket to Aarhus, getting on a train to Malmö and still being driven to Aarhus.

It makes *no* sense that the trades were not executed in accordance with the trade notes. It also makes *no* sense that the information in the custody statement (...) is not in accordance with the contractual terms of the commercial notes (...).

Further, it misses the point that pension plans have not responded to significant errors in trading reports confirming stock trades for significant millions of dollars.

Indeed, a number of trade memoranda state that pension plans are required to check the information. For example, a commercial note from (...) states that

> *"Please verify all details for accuracy, and immediately inform (...) of any errors. (...) cannot be held responsible for errors not brought to our attention immediately. The Purchaser and the Seller acknowledge receipt of this confirmation, that the terms contained herein and any and all actions and/or disputes arising therefrom are the sole and exclusive responsibility of the purchaser and the seller, and further agree to hold Brokers, and its agents and/or representatives harmless from any dispute and/or action that may arise as a consequence of the above transaction."*

As it appears, (...) disclaims responsibility for all errors not immediately reported. Given the size of the trades, it is clear that the pension plans *would* obviously have checked the trades closely and would have reacted to discrepancies if they had been real stocks. This is particularly true because the pension plans would not be able to bear a loss caused by errors in the trade notes. The reason why the pension plans have not reacted is, of course, that there have been no stock trades and therefore there are no risks associated with an incorrect confirmation of the contractual terms.

It does not make sense that brokers can make such mistakes when pension plans at the same time describe brokers as *"professional service providers,"* (...). The attempt by the pension schemes to reinforce the credibility of the brokers by referring to the fact that the brokers have undergone a *"special scrutiny by the UK Financial Services Authority,"* (...) falls flat when one considers how fundamental the errors are.

### 5.4.3 Concrete examples of errors in commercial invoices

There are many cases where the trade notes (...) do not match the information in the custody statements (...) and Credit Advices (...). This implies that the undocumented settlement invoked by the pension plans with reference to the custody statements (...) does not match the terms of the

the commercial notes (...). The pension plans have not provided any evidence as to how the settlement should have been done correctly, despite the fact that the commercial invoices were faulty.

### 5.4.3.1   Two different trade dates for the same transaction

(...) shows a case where two different trade dates ("Trade Dates"), respectively March 5, 2015 and March 31, 2015, were used for the same alleged stock trade in 3,092,779 TDC stocks with a value of approximately DKK 167 million.

The attachment consists of a Credit Advice, a custody statement, an invoice from the broker (...) and a trading note from the same. The documents relate to [Pension Plan C] and have already been presented in court.

The custody statement submitted in the case is available at (...). The document was prepared by [Pension Plan C's] custodian, West Point (who is a Shah custodian). It states that the trade date ("Trade Date" framed in red) is *March 05, 2015* and that the trade in 3,092,779 TDC stocks is a *purchase* ("Buy" framed in red).

The Credit Advice provided in the case is available at (...). The document was also prepared by West Point. It is dated March 10, 2015 and states that [Pensionsplac C] owned 3,092,779 TDC stocks over the ex-date of March 06, 2015 ("Ex Date" framed in red). The Credit Advice is therefore supported by the trade date set out in the custody statement.

The commercial invoice submitted in the case is available at (...). The document was prepared by the broker, (...), who apparently conducted the trade in the TDC stocks. It appears from the trade note that the trade date ("Trade Date" framed in red) is *March 31, 2015* and that the trade in 3,092,779 TDC stocks relates to a *purchase* ("BUY" framed in red).

Thus, there is a discrepancy between the trade dates for the *same* alleged stock trade.

Only one of the trade dates can be correct, and if the trade note is to be given such *"decisive"* significance as [Pension Plan C] suggests, it must be March 31, 2015. This would mean that [Pension Plan C] did not own 3,092,779 TDC stocks on the ex-date, and that the Credit Ad- vice on which [Pension Plan C's] reimbursement request was based is thus not correct.

There are several indications that the discrepancy between the custody statement and the handling note is due to an error by the broker.

First of all, the reference number of the commercial invoice ("TRADE CONFIRMATION REFERENCE: e184376" framed in red) also appears on the invoice of (...) dated March 31, 2015 (...). Here, the trade date ("Trade Date" framed in red) *is* indicated as *March 05, 2015* and thus not March 31, 2015 as indicated in the trade note.

In addition, March 10, 2015 is mentioned as the *settlement date* ("Settlement on March 10, 2015") under "SETTLEMENT TERMS" in the Commercial Note (...). This settlement date also appears in the custody statement on (...) ("Settlement Date" framed in red), which could indicate that the error only concerned *the trading day* indicated by the broker.

However, this is not related to the fact that "SETTLEMENT TERMS" are indicated as "T+2" in the trade note. If the trade date was March 05, 2015 (as indicated in the custody statement) and the settlement date was March 10, 2015, then the trade would have been executed "T+3" and not as indicated "T+2."

Thus, March 7th and 8th were Saturday and Sunday, while the rest of the days in between are working days, see details on the calculation of the delivery time in § 5.6, below.

The confusion is even greater when in the commercial note above "SETTLEMENT TERMS" under "Settlement Date" it says "T+1." This settlement period is not correct either if the trading day was March 5, 2015 as provided in the custody statement.

the TVC Law Firm states in (...) that it is *'the broker who has made a mistake'* and that it was *"a general problem that (...) had."*

Thus, according to the pension plans, it was a general problem that trade notes (for stock transactions of several hundred million DKK) prepared by the broker (...) were incorrectly attached. This seems quite frivolous for a professional broker to do such large stock deals.

In addition, it does not make sense that the trade has been conducted in accordance, as stated in the custody statement, when the written contract confirmation (the trade note) states otherwise.

### 5.4.3.2    Commercial invoices confuse buying and selling

There are several examples where the alleged stock trades appear as *sales* under the custody statement and broker's invoice, but appear as "*BUY*" in the trade note (...).

For example, there is a discrepancy between the custody statement (...) and a trade note relating to a trade in Maersk B stocks (...). (...)

It appears from the custody statement, 3rd line, that 7,896 Maersk B-stocks have been *sold* ("Transaction Type: Sell") to the broker, (...) ("Counterparty") with trade date June 19, 2015 ("Trade Date") and settlement date June 23, 2015 ("Settlement Date").

On the contrary, the trading note prepared by (...), which concerns precisely 7,896 Maersk B stocks, shows that the stocks have been *purchased* ("YOU: BUY"). The trading note is addressed to [Pension Plan B] and "YOU: BUY" thus means that [Pension Plan B] is *purchasing* 7,896 Maersk B stocks.

According to TVC Law Firm, this is *"also an expression of human error"* and the pension plan *"have not noticed this typographical error,"* (...), although it must be said to be a rather crucial error.

Again, it is very remarkable that [Pension Plan B] allegedly ended up selling stocks in accordance with the intentions, even though the broker who was in charge of matching between buyer and seller, according to the trading note, has perceived [Pension Plan B] as a buyer – and thus must have matched with a seller, not another buyer.

### 5.4.3.3    Trade notes do not take public holidays into account (new)

Another example of broker error is found in settlement terms around Danish holidays, especially on- shine. As an example, (...).
Settlement/delivery of stocks and money respectively is of crucial importance when concluding trades. It is of importance for when financing has to be obtained and when the stock/purchase price is actually available.